**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

CHERI LYNN GRAY,

                    Plaintiff,

    vs.

NANCY A. BERRYHILL, Deputy
Commissioner of Social Security for Operations,

                    Defendant.

Case No. 3:17-cv-00126-SLG

## DECISION AND ORDER

On June 19, 2012, Cheri Lynn Gray filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act") respectively,[1] alleging disability beginning December 29, 2011.[2] Ms. Gray has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[3]

Ms. Gray filed an opening brief seeking a remand for the payment of benefits.[4] The Commissioner filed an Answer and a brief in opposition to Ms. Gray's opening brief.[5] Ms. Gray filed a reply brief.[6] Oral argument was not requested and was not necessary to

---

[1] The Court uses the term "disability benefits" to include both disability insurance and SSI.

[2] Administrative Record ("A.R.") 16, 437–43.

[3] Docket 1 (Gray's Compl.) at 2.

[4] Docket 18 (Gray's Br.).

[5] Docket 14 (Answer); Docket 22 (Defendant's Br.).

[6] Docket 23 (Gray's Reply).

the Court's decision.  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[7]  For the reasons set forth below, Ms. Gray's request for relief will be granted in part.

## I.     STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[8] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[10]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[11]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[12]  A reviewing

---

[7] 42 U.S.C. § 405(g).

[8] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[9] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[10] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[11] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[12] *Anderson v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [he] did not rely."[13] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[14]

## II. DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[15] In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[16] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[17]

The Act further provides:

---

[13] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[14] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[15] 42 U.S.C. § 423(a).

[16] 42 U.S.C. § 1381a.

[17] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[18]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[19] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[20] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[21] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[22] The steps, and the ALJ's findings in this case, are as follows:

---

[18] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[19] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[20] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[21] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[22] *Tackett*, 180 F.3d at 1101.

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Ms. Gray has not engaged in substantial gainful activity since December 29, 2011, the alleged onset date.*[23]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *The ALJ determined that Ms. Gray has the following severe impairments: "degenerative disc disease of the lumbar and cervical spines, obesity, hypertension, headache, migraine headache, depression NOS, anxiety NOS, personality disorder/cluster B traits, and prescription narcotic overuse." The ALJ found that fibromyalgia, carpal tunnel syndrome, PTSD, and bipolar disorder were not established as severe impairments. The ALJ determined that "no clear or formal diagnosis was made" of somatoform disorder and it "is not a medically determinable impairment" for Ms. Gray.*[24]

**Step 3.** Determine whether the impairment or combination of impairments is the equivalent of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1 that are so severe as to preclude substantial gainful activity. If the impairment is the equivalent of any of the listed impairments, and meets the duration requirement, the claimant is

---

[23] A.R. 19.

[24] A.R. 19–22.

conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Ms. Gray does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.*[25]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[26]  *The ALJ concluded that Ms. Gray has the RFC to perform medium work except she "cannot climb ladders, ropes, or scaffolds.  In addition, [she] cannot be exposed to unprotected heights and hazardous machinery.  Furthermore, [Ms. Gray]'s residual functional capacity includes a restriction to one to four step tasks."*[27]

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that*

---

[25] A.R. 22–24.

[26] 20 C.F.R. § 404.1520(a)(4).

[27] A.R. 24–25.

*Ms. Gray is able to perform past relevant work as a dialysis technician, laboratory technician, and secretary.*[28]

The ALJ concluded that Ms. Gray was not disabled from December 29, 2011 through the date of the decision.[29]

## III. PROCEDURAL AND FACTUAL BACKGROUND

Ms. Gray was born in 1973; she was 38 years old on December 29, 2011.[30] She worked as a dialysis technician from November 2000 to November 2006 and again from March 2009 to December 2011. Her duties included assisting nonambulatory patients in transferring between a wheelchair and a dialysis chair. From approximately April 2006 to January 2010, Ms. Gray worked as a nurse assistant.[31] On December 29, 2011, Ms. Gray sustained a back injury at her place of work while "transporting a patient from his dialysis into his wheelchair." She continued to work the rest of her shift at Liberty Dialysis and attempted to go to work the next day, but "was in severe pain." Ms. Gray was "sent to the emergency room" on December 30, 2011.[32]

---

[28] A.R. 33.

[29] A.R. 34. Because the ALJ here determined that Ms. Gray was capable of performing past relevant work at Step Four, the evaluation process did not consider Step Five.

[30] A.R. 437.

[31] A.R. 108, 171, 661.

[32] A.R. 121–22.

On December 5, 2012, the Social Security Administration ("SSA") determined that Ms. Gray was not disabled under the applicable rules.[33] Ms. Gray timely requested a hearing before an ALJ.[34] She appeared and testified without a representative at a hearing held on July 9, 2013 before ALJ Paul Hebda.[35] ALJ Hebda noted and Ms. Gray agreed at the hearing that the "major issu[e] that we're dealing with is your back problem."[36] Ms. Gray stated, "I live day-to-day either in excruciating pain or in a cloud zoned out from the pain meds, in that state of —yes, pill high is what I like to say."[37] During the July 2013 hearing, ALJ Hebda continued the hearing to February 13, 2014 to obtain "a consultative examination" and updated medical evidence.[38] Ms. Gray appeared at the February 2014 hearing and again testified without a representative.[39] The ALJ issued a ruling unfavorable to Ms. Gray on March 5, 2014.[40] On September 18, 2015, the Appeals Council vacated the ALJ's March 5, 2014 decision and remanded the case back to the ALJ to consider new and material evidence submitted after the March 5, 2014 decision.[41]

---

[33] A.R. 16, 206–10, 216–20.

[34] A.R. 226–28.

[35] A.R. 114–43.

[36] A.R. 118.

[37] A.R. 126.

[38] A.R. 91, 139.

[39] A.R. 91–111.

[40] A.R. 177–92.

[41] A.R. 202–04. In the September 18, 2015 order, the Appeals Council noted that the record

On June 10, 2016, Ms. Gray requested a continuance to obtain new representation.[42]  On

September 26, 2016, Ms. Gray again appeared before ALJ Hebda and testified with an

attorney.  Two medical experts and a vocational expert also testified at the hearing.[43]  On

January 10, 2017, ALJ Hebda issued a second ruling unfavorable to Ms. Gray.[44]  On

February 24, 2017, Ms. Gray requested review of the decision and on May 9, 2017, the

Appeals Council denied the request for review.[45]  Ms. Gray timely appealed to this Court

on June 1, 2017.[46]

---

reflected Ms. Gray's complaints of neck pain and the use of an assistive device to ambulate. Specifically, the Council referenced an MRI from August 2014, which showed "a worsening in the claimant's impairment since the MRI performed in August 2012" and determined that the ALJ needed to evaluate the "nature, severity, and limiting effects of the claimant's neck impairment." The Council also reviewed evidence from Heather A. Bell, PT, Thomas Grissom, M.D., and Matthew Peterson, M.D., regarding Ms. Gray's use of an assistive device.  The Council determined that the ALJ should review the "medical necessity" of Ms. Gray's use of an assistive device to ambulate.  The Council also reviewed new and material evidence indicating that Ms. Gray continued to have "ongoing issues with her lumbar discs which originated in December 2011."  The Council ordered the ALJ to obtain updated medical records and obtain a consultative examination if the evidence did not adequately clarify the record, obtain evidence from a medical expert if necessary and available to clarify the nature and severity of Ms. Gray's impairments, further consider Ms. Gray's maximum RFC with "specific references to evidence of record in support of assessed limitation," and obtain supplemental evidence from a vocational expert.  The Council also found further evaluation of the opinions provided by Dr. Chalifour and OT Kerris was necessary.

[42] A.R. 86.

[43] A.R. 48–83.

[44] A.R. 16–34.

[45] A.R. 1–5.

[46] Docket 1.

*Medical Records Prior to December 29, 2011*

Although Ms. Gray's medical record dates back to 2003, the Court's review of the record is primarily focused on the period after the alleged onset date of December 29, 2011, which is the date on which Ms. Gray sustained a back injury at her place of work while "transporting a patient from his dialysis into his wheelchair."[47]

However, the following records before December 2011 are noted:

On January 7, 2003, Ms. Gray visited the emergency department at Providence Alaska Medical Center ("Providence"). She indicated she had injured her back two months ago while at work, with considerable pain thereafter. She was assessed with "[a]cute and subacute thoracic and lumbar back strain."[48]

On February 5, 2003, Ms. Gray saw Michael James, M.D., at Alaska Spine Institute. He noted that Ms. Gray had a normal straight leg raising test and normal sensation, strength, and reflexes in the lower extremities. He also noted that Ms. Gray had undergone an MRI "which is unremarkable" and that "x-rays demonstrate thoracic scoliosis." He scheduled her for thoracic facet blocks to "manage her pain."[49]

---

[47] A.R. 121–22.

[48] A.R. 768–775. Ms. Gray followed up at Ravenwood Family clinic on January 10, 13, 17, 2003 and reported feeling better and better with an anticipated return date of January 20, 2003. A.R. 688–95. In treatment notes from January 24, 2003, the provider noted Ms. Gray's request for Percocet or "a different muscle relaxant." A.R. 687. On February 25, 2003, Ms. Gray reported that she had no relief from previous bilateral T8, T9, and T10 medial branch blocks. A.R. 736.

[49] A.R. 739–40.

From approximately March 3, 2003 to June 5, 2003, Ms. Gray underwent physical therapy for treatment of mid-back pain.[50]

On April 26, 2003, Ms. Gray underwent a medical evaluation by James P. Robinson, M.D., PhD. He diagnosed her with a "nonspecific diagnosis of thoracic strain," but that there were "no unequivocal objective findings to support this diagnosis." He noted that Ms. Gray reported "rather substantial disability associated with her pain" and that her "score of 50 on the Impairment Impact Inventory is substantially higher than most individuals undergoing independent medical examinations." Dr. Robinson opined that Ms. Gray "warrants DRE Category II, or 5% whole person impairment of the thoracic spine."[51]

On July 11, 2003, Ms. Gray went to the emergency department at Providence due to thoracic back pain. She was diagnosed with back strain. She reported having "trouble with her back since last November" and "was at work feeling well when she slipped on some water wrenching her back." She was assessed with back strain and prescribed Vicodin, Flexeril, Demerol, and Vistaril.[52]

On July 29 and August 12, 2003, Ms. Gray visited Dr. James for follow up. At the visit on August 12th, Dr. James noted that she had an "absolutely normal MRI" and again

---

[50] A.R. 713–19. On June 5, 2003, the provider noted that Ms. Gray "still demonstrates impaired functional stabilization/strength." A.R. 713.

[51] A.R. 697–707. On June 5, 2003, Dr. James also opined that Ms. Gray's impairment rating was 5% impairment. A.R. 729.

[52] A.R. 762–66.

noted that Ms. Gray had a "lack of pathology to explain her severe increase in symptoms and that this must be attributed to a thoracic strain if her facet joint injections do not provide any relief."[53]

On June 17, 2008, Ms. Gray again went to the emergency department at Providence. She reported upper back sprain after pulling out a sleeper couch for a patient.[54]

On February 2, 2010, Ms. Gray went to Providence's emergency department for "severe back pain" after a slip and fall while at work.[55] The x-ray taken of her spine demonstrated "mild scoliosis," but was "negative for acute osseous finding." She had a normal chest x-ray.[56]

On May 19, 2011, Ms. Gray saw Kristofer A. Sargent, M.D. for an office visit at Providence Family Medicine Clinic ("PFMC"). Ms. Gray reported "excruciating upper back pain" and received a trigger point injection in the left scapular area. She was "encouraged to resume normal activity and to continue walking tonight." Her prescriptions included zolpidem, metformin, diphenhydramine, hydrocodone-ibuprofen, oxycodone-

---

[53] A.R. 723–26.

[54] A.R. 753, 755.

[55] A.R. 741, 746.

[56] A.R. 742–43.

acetaminophen, cyclobenzaprine, ondansetron, bisacodyl, ibuprophen, estradiol cypionate, cholecalciferol, varenicline, metaxalone, and lidocaine.[57]

*Medical Records after December 29, 2011*

At 2:15pm on December 30, 2011, Ms. Gray went to the emergency department at Providence with upper back pain "after lifting a patient last night." The provider, Andrew Elsberg, M.D., reported that Ms. Gray's physical exam revealed "paraspinous tenderness of the T-spine," but "normal extremity strength and sensation," with "no evidence of hyperreflexia," and "no midline tenderness." Dr. Elsberg diagnosed Ms. Gray with back strain and noted "[s]he will be put on light duty for the next week." The report lists the following medications: ibuprofen, zolpidem tartrate, estradiol cypionate, cholecalciferol, varenicline tartrate, metaxalone, metformin, and diphenhydramine.[58]

On January 3, 2012, Ms. Gray received x-rays of her thoracic and lumbar spine. The impressions showed moderate thoracolumbar and thoracic spinal scoliosis, some degenerative changes within the upper to midthoracic spine, and minimal endplate depressions within the midthoracic spine. A MRI of Ms. Gray's lumbar spine showed that "bone alignment is normal," "disk contours are normal," and showed no "disk hernia or other disk abnormalities." An "[i]ncidental L1 vertebral body hemangioma" was noted; otherwise the MRI of Ms. Gray's thoracic spine was normal.[59]

---

[57] A.R. 801–04.

[58] A.R. 777-79.

[59] A.R. 787–88.

On January 11, 2012, Ms. Gray again saw Christina Brown, D.O., at PMFC, and reported back pain. Dr. Brown noted that Ms. Gray "was in in the [emergency department] and given a [prescription] for Percocet and Flexeril," but that Ms. Gray "didn't fill these because she doesn't like to take medications." Dr. Brown also noted that Ms. Gray reported "[s]he is not taking any medications at this time including diabetic medications— no reason given."[60] At a follow-up appointment the next day, Dr. Brown noted that Ms. Gray "has been taking her pain medications which have helped" and also noted that her gait was "normal" and she appeared "more comfortable." Dr. Brown referred Ms. Gray to physical therapy and to the Alaska Spine Institute.[61]

On January 17, 2012, Ms. Gray saw Beth Cant, M.D., at PFMC; she reported worsening low back pain. Dr. Cant noted that Ms. Gray had undergone x-rays and MRIs of her thoracic and lumbar spine, but that "no marked abnormalities [were] found on these exams." During the physical exam, Dr. Cant reported that Ms. Gray refused "to display her back range of motion" or sit on the exam table. The doctor also noted that "while distracting this patient, she did not complain of pain while pressing on her lumbar spine and right sided paraspinal muscles. However, when I asked if this was painful, she then winced." Ms. Gray's straight leg raise was negative bilaterally; her lower extremity strength was +5 over 5 on the left and right "other than with dorsiflexion and flexion at the

---

[60] A.R. 814–17.

[61] A.R. 818–21; 1087.

knee which was +4/5." Dr. Cant referred Ms. Gray to the Alaska Spine Institute and gave her a work release for one week.[62]

On January 18, 2012, Dr. Cant filled out a Worker Status Report that released Ms. Gray to "modified duty" from January 20, 2012 to January 27, 2012. In the report, Dr. Cant reported a "[d]ecreased range of motion with lumbar flexion, extension, bilateral rotation," with "+4/5 [right] lower extremity strength with dorsiflexion of ankle and flexion [at the] knee," and +1/4 reflexes for Ms. Gray's patellar/Achilles and "+2/4 on [the] left." Dr. Cant projected that Ms. Gray could resume "full duty" work on January 30, 2012.[63]

On January 19, 2012, Ms. Gray saw Dr. Sargent for "re-evaluation of her ongoing back pain." Dr. Sargent noted that Ms. Gray was "in obvious discomfort sitting awkwardly." He observed "[n]o bony tenderness," "strength equal bilaterally," but "[p]araspinal pain and tightness," with "[s]everal trigger points in upper and lower back elicit severe pain." Dr. Sargent also noted that Ms. Gray walked "with a smooth gait" and her "mood is upbeat, affect full, insight and judgement good."[64] At this visit, Dr. Sargent excused Ms. Gray from work "for an additional two weeks," with a provisional return to work on February 2, 2012.[65]

---

[62] A.R. 791, 847–51.

[63] A.R. 829–30.

[64] A.R. 832–35.

[65] A.R. 831.

On February 1, 2012, Ms. Gray saw Daryl Chalifour, D.C., at Bilan Chiropractic. She reported neck, mid-back and lower-back pain. She told the doctor about her work related injury on December 29, 2011, and indicated she had "never injured her same area before." She reported that "her symptoms are aggravated when she bends, uses a computer, sleeps, flexes and extends, is working, stands up, drives, is under stress and goes up stairs" and that her symptoms are relieved when she takes prescription medications. Dr. Chalifour reported that "[t]esting of [Ms. Gray]'s cervical range of motion produced the result of decreased cervical flexion with pain, extension with pain, left rotation with pain, right rotation with pain, left lateral flexion with pain and right lateral flexion with pain." He observed the same in the lumbar spine. He also observed that "[b]iomechanical joint dysfunction was apparent over [Ms. Gray]'s C1, C6, T1, T6, T12, L5 and left SI vertebral segments." At the visit, Dr. Chalifour performed manual adjustments "over all restricted vertebral segments that were identified through a combination of x-ray analysis and motion palpation." He noted that "[a]ll segments moved well, and appropriate audible releases were heard with each adjustment." Dr. Chalifour reported that "[b]efore the visit was over, [Ms. Gray] stated that she felt better."[66]

Also on February 1, 2012, Ms. Gray received x-rays of her full spine. The report found "[n]o evidence of recent fracture or dislocation; [e]arly mid and lower cervical spine degenerative disc disease with early mid apophyseal osteoarthritis; [e]arly to moderate thoracic spine degenerative disc disease with T9 and T10 costotransverse osteoarthritis;

---

[66] A.R. 985–88, 991.

[e]arly to moderate L5-S1 degenerative disease with accompanying early lower lumbar apophyseal osteoarthritis; [and] [c]ervical hypolordosis with anterior weight bearing and a right lateral cervicothoracic list; right lateral thoracolumbar curvature."[67]

On February 2, 2012, Ms. Gray again visited Dr. Chalifour. He reported that Ms. Gray "stated that her problems become better when she gets adjusted." Dr. Chalifour again reported that "[t]esting of [Ms. Gray]'s cervical range of motion produced the result of decreased cervical flexion with pain, extension with pain, left rotation with pain, right rotation with pain, left lateral flexion with pain and right lateral flexion with pain." Dr. Chalifour observed the same in the lumbar spine. He again observed that "[b]iomechanical joint dysfunction was apparent over [Ms. Gray]'s C1, C6, T1, T6, T12, L5 and left SI vertebral segments." Also at this visit, Dr. Chalifour performed manual adjustments "over all restricted vertebral segments that were identified through a combination of x ray analysis and motion palpation." He again noted that "[a]ll segments moved well, and appropriate audible releases were heard with each adjustment."[68]

On February 3, 2012, Ms. Gray followed up again with Dr. Chalifour. Ms. Gray reported "increased low back pain radiating to the right leg while laying down." Dr. Chalifour's observations and reports regarding Ms. Gray's conditions were identical to the previous visits. He noted that "[b]ased upon the results so far, [Ms. Gray]'s prognosis is

---

[67] A.R. 990.

[68] A.R. 992.

good because she is responding well to her chiropractic care."[69]  Dr. Chalifour developed an Individualized Treatment Plan ("ITP") for Ms. Gray.  He recommended refraining from "activities that cause pain, driving, excessive sitting, lifting things, using multiple pillows, exercising using poor posture and improper techniques, watching television with poor posture, sitting close to the steering wheel while driving, sleeping on her stomach, prolonged standing and twisting her torso."[70]

On February 6, 2012, Ms. Gray followed up with Dr. Chalifour.  At the visit, she stated that she was "doing worse than she was doing on her last visit."  Dr. Chalifour's observations and reports were identical to the previous visits.  He continued to note that "[b]ased upon the results so far, [Ms. Gray]'s prognosis is good because she is responding well to her chiropractic care."[71]

Also on February 6, 2012, Ms. Gray saw Beth Wagner, D.O., at PFMC.  Dr. Wagner observed that Ms. Gray appeared "very uncomfortable on the exam table."  She diagnosed Ms. Gray with "lumbago; back pain, thoracic; somatic dysfunction of lumbar region; somatic dysfunction of thoracic region; and scoliosis."  Dr. Wagner also noted that she "declined refills of [Ms. Gray's] pain meds," and instead deferred to Ms. Gray's

---

[69] A.R. 993.

[70] A.R. 1054–55.

[71] A.R. 994.

primary care provider.[72]  Dr. Wagner reported that Ms. Gray was "happy with her chiropractic care and I think that she can continue with this instead of OMT at this time."

On February 7, 2012, Ms. Gray saw Dr. Sargent at PFMC; she again requested a refill of pain medication.  Dr. Sargent declined the refills and deferred to Ms. Gray's primary care provider.[73]

On February 8, 2012, Ms. Gray saw Dr. James at Alaska Spine Institute.  Dr. James diagnosed Ms. Gray with "discogenic low back pain with some element of radiculopathy."  Ms. Gray reported her pain had onset when she was injured on December 29, 2011 and since then had gotten worse.  Upon examination, Dr. James reported impaired mobility of the lumbar spine, a positive straight leg test on the right, and mild hypesthesia of the posterior thigh.  He noted that Ms. Gray's reflexes were +1 and symmetrical. [74]

On February 9, 2012, Ms. Gray followed up with Dr. James.  He indicated that "she probably has a bulge and annular tear at L4-5 on the right."  He recommended an epidural steroid injection and physical therapy.  He provided a prescription for Tylenol No. 3 and Flexeril.[75]  Dr. James also completed a work status report on that date, which stated that Ms. Gray was "[t]otally disabled for work" through February 29, 2012.[76]

---

[72] A.R. 843–44.

[73] A.R. 1452.

[74] A.R. 871–72.

[75] A.R. 869.

[76] A.R. 870.

At several visits, from February 8 to February 23, 2012, Ms. Gray saw Dr. Chalifour for follow up exams and adjustments. He reported at each visit that Ms. Gray's "current prognosis is good because she is responding well to her chiropractic care."[77] However, at subsequent visits on February 24, 27, 29, 2012 and March 2, 5, 2012, Dr. Chalifour changed his prognosis to "guarded" as Ms. Gray was "responding slowly."[78]

On February 15, 2012, Ms. Gray received epidural steroid injections at Alaska Spine Institute.[79]

On February 28, 2012, Ms. Gray saw Dr. James for a follow up exam. She reported that following the epidural injection of February 15, 2012, "she has had 40% to 50% relief of her preinjection pain with regard to her low back. Her leg pain is reduced in its frequency but not intensity. There has been no relief of her mid back pain." He recommended continuing with chiropractic care and following up with a physical therapist.[80] Dr. James opined that Ms. Gray was then to return to work part-time for four hours per day for three days a week for two weeks, then five days a week for two weeks; she could lift ten pounds occasionally and five pounds frequently; but she was to avoid prolonged sitting and standing.[81]

---

[77] A.R. 995–1003.

[78] A.R. 1004–10. .

[79] A.R. 902.

[80] A.R. 866.

[81] A.R. 867.

Case No. 3:17-cv-00126-SLG, *Gray v. Berryhill*
Decision and Order
Page 20 of 90

On March 5, 2012, Ms. Gray had a physical therapy evaluation with Alan Blizzard, PT. He recommended physical therapy three times a week for range of motion and strengthening.[82]

On March 8, 2012, Ms. Gray received physical therapy. The therapist noted that Ms. Gray reported continued soreness to lower back and right hip and had minimal palpable pain over the beltline on the right. The therapist noted that Ms. Gray was able to tolerate the exercises.[83]

At chiropractic visits throughout March 2012, Dr. Chalifour reported that Ms. Gray's "prognosis was good" because she was "responding well to her chiropractic care."[84]

On March 29, 2012, Ms. Gray saw Dr. James and reported "more severe back pain than previously," as well as hip pain. Upon examination, Dr. James observed "self-limited restriction of range of motion"; Ms. Gray's "[s]eated leg raise [was] negative" with "no specific weakness of either lower extremity."[85]

---

[82] A.R. 879–80.

[83] A.R. 882, 897, 922–23, 925–27, 950, 951, 955–59, 961, 1025. Ms. Gray attended physical therapy sessions on March 9, 14, 19, 21, 23, 28, 29, 30 and April 3, 4, 5, 9, 12, 16, 17, 19, 2012. On March 21, 30, 2012 and April 3, 4, 5, 9, 2012, Ms. Gray reported feeling better, good or "ok" overall. A.R. 923, 955, 959, 926, 961, 1025. On March 30, 2012, the therapist noted "improved gait [and] speed [with] equal stride." A.R. 923. After April 19, 2012, the next record of physical therapy was not until over two years later, on June 5, 2014. A.R. 1728.

[84] A.R. 1011–1022. Ms. Gray visited Dr. Chalifour on March 7, 9, 14, 15, 16, 19, 21, 23, 28, and 29, 2012.

[85] A.R. 865.

Also on March 29, 2012, the physical therapist at Alaska Spine Institute reported that Ms. Gray experienced "on/off episodes" of increased and decreased pain in the lower back and right lower extremity. The therapist noted that "on [a] good day [Ms. Gray is] able to ambulate . . . and tolerate exercise."[86]

On March 30, 2012, Ms. Gray returned to Dr. Chalifour for chiropractic treatment. She stated that she was "doing better" since her last office visit. Dr. Chalifour reported that Ms. Gray "let me know that her symptoms still improve when she gets adjusted."[87]

On April 3, 2012, Ms. Gray returned to Dr. Chalifour. Although she reported doing worse than her last visit, Dr. Chalifour reported that she was still "responding well to her chiropractic care."[88]

On April 4 and 5, 2012, Ms. Gray saw Dr. Chalifour. She reported "doing better" at the April 4th visit. The next day, Ms. Gray reported "doing worse." However, in both records of the appointments, Dr. Chalifour continued to opine that she was responding well to treatment.[89] Also on April 4, 2012, Dr. Chalifour opined that Ms. Gray should be restricted to "light duty" with "[n]o repeated bending, twisting, stooping, lifting, kneeling or

---

[86] A.R. 878.

[87] A.R. 1023.

[88] A.R. 1024.

[89] A.R. 1025–26.

carrying." He also opined that her anticipated full duty date was "undetermined at this time."[90]

In a physician's report on April 10, 2012, Dr. Chalifour opined that Ms. Gray could perform modified work as of February 20, 2012.[91]

On April 17, 2012, Dr. Chalifour filled out an Employment Solutions form for the State of Alaska. In it, he opined that Ms. Gray would not "have the physical capacities to perform the physical demands" of her previous work as a dialysis technician, nurse assistant, or medical assistant. He also opined that at the time of medical stability, Ms. Gray "will incur a permanent impairment greater than 0 as a result of her neck and back injury."[92]

During April and May 2012, Ms. Gray followed up with Dr. Chalifour. Throughout that time, he continued to opine that she was responding well to chiropractic treatment.[93]

On May 15, 2012, Ms. Gray visited Andrew Fulp, PA-C, at Orthopedic Physicians Anchorage. He noted that upon examination, Ms. Gray "has a great deal of difficulty standing from a seated position and appears a little unsteady on her feet." He also observed that "[s]he can walk without assistance of her cane, but she again is unsteady and has a very slow and shuffling gait." He noted that "she has 3/5 strength in bilateral

---

[90] A.R. 898.

[91] A.R. 962.

[92] A.R. 1282–88.

[93] A.R. 1027–1046, 1144.

lower extremities to quadriceps function," and "4/5 bilateral lower extremity strength to EHL and anterior tibialis function." PA Fulp reported that she "is unable to extend any past neutral and in fact, is in a pitched forward position most of the time" and that the hip examination "shows pain with any type of maneuvering of the hip." He also observed a "negative bilateral straight leg raise." The x-rays ordered and interpreted by PA Fulp showed "generally well-maintained disk heights," "maybe slight disk space narrowing at L5 to S1," but "no significant anterior osteophyte formation and no significant instability with flexion/extension views." He noted normal and symmetric reflexes. PA Fulp concluded that he had "no great explanation as to why she is having such significant limited mobility and pain with any type of mobility. She generally has normal imaging." He reported that Ms. Gray declined his suggestion to try a new physical therapist.[94] PA Fulp completed a disability status for Ms. Gray that stated as of May 15, 2012, Ms. Gray was "totally disabled," but would be able to return to work on June 15, 2012.[95]

On May 24, 2012, Dr. Chalifour completed an "excuse slip" indicating that Ms. Gray was unable to return to work because of "severe low back pain when standing, sitting, or lying down."[96] On May 30, 2012, Ms. Gray followed up with Dr. Chalifour. At the visit, he

_____

[94] A.R. 928–31.

[95] A.R. 936.

[96] A.R. 1321.

noted that Ms. Gray "explained that her symptoms are still relieved when she gets adjusted and takes prescription medications." Ms. Gray's prognosis was "guarded."[97]

On June 5, 2012, Dr. Chalifour completed a physician's report for the Alaska Workers' Compensation Board. He concluded that Ms. Gray was not medically stable and that it was undetermined if the injury would permanently preclude return to work or result in a permanent impairment. He again noted that Ms. Gray had been released for modified work on February 20, 2012.[98]

On June 7, 2012, Ms. Gray saw Franklin Ellenson, M.D., for a neurology consultation. Ms. Gray's chief complaint was "back pain." Dr. Ellenson noted normal muscle tone. He also reported that the "[s]trength of the deltoids, biceps, triceps, wrist flexors, wrist extensors, grip strength, hip flexors, knee flexors, knee extensors, ankle dorsiflexor are 5/5 throughout." He noted that "[p]ain limited full testing, but no focal areas of neurological weakness are detected" and that she had an "[a]ppropriate gait and arm swing, with normal heel, toe, and tandem gait." He diagnosed back pain and prescribed "Valium at night for muscle spasms," as well as massage therapy for ongoing pain. He saw "no need for surgical intervention" and told Ms. Gray she "is likely to get better."[99]

On June 21, 2012, Dr. Chalifour notified Liberty Northwest that "Ms. Gray is not capable of returning to work in a similar capacity as she was previously." He

---

[97] A.R. 1047.

[98] A.R. 1213.

[99] A.R. 967–71.

recommended an independent medical evaluation, "due to the long standing nature of Ms. Gray's pain."[100]

On July 14, 2012, Ms. Gray saw Douglas Bald, M.D., an orthopedic surgeon, for an independent medical evaluation requested by her employer, Liberty Dialysis. He reviewed Ms. Gray's medical records since December 29, 2011. Upon examination, Dr. Bald observed that Ms. Gray "is able to ambulate very briefly without use of the cane, but she has a very slow, wide-based, shuffling gait pattern and demonstrates a sense of instability on her right leg." Dr. Bald diagnosed Ms. Gray with thoracolumbar strain by history and "[s]evere psychogenic pain behavior and symptom magnification." Specifically, he noted that "[t]he most significant finding that is identified on today's examination is a severe element of psychogenic pain behavior and inconsistencies, which is likely the major contributing source of [Ms. Gray]'s persistent symptomatology and self-perceived disability." He opined that "[o]n a strictly objective physical basis, there does not seem to be any reason that Ms. Gray would not be capable of returning to her regular work duties, though at this point in time she perceives herself as being severely disabled and it is unlikely that anything treatment wise is going to reverse that perception." In a work situation, Dr. Bald opined that continuous standing should be limited to one hour,

---

[100] A.R. 1067. On June 19, July 3, July 17, and July 31, 2012, in physician's progress reports to the Alaska Department of Labor, Dr. Chalifour opined that Ms. Gray could be released for modified work as of February 20, 2012, but that she was not "medically stable" and it was "undetermined" whether Ms. Gray's injury would preclude a return to the previous job or result in permanent impairment. A.R. 979, 1068, 1077, 1200.

and total standing limited to four hours in an eight-hour work day. Occasional lifting would be limited to fifty pounds.[101]

At multiple follow up appointments in June and July of 2012, Dr. Chalifour noted that Ms. Gray was "responding favorably to Myofascial Release."[102] At other appointments, he noted that Ms. Gray "explained that her symptoms are still relieved when she gets adjusted and takes prescription medications." However, his prognosis at each visit was "guarded because she has responded well to chiropractic care in the past."[103]

On August 3, 2012, Dr. Chalifour completed another Employment Solutions form. He opined that Ms. Gray could sit for an "unlimited" time during an average work day and stand or walk one hour out of each work day. He opined that she could lift ten pounds frequently and up to forty-five pounds occasionally, but could not bend, squat, climb, crawl, stoop, or kneel. He noted that Ms. Gray could reach above shoulder level, perform simple grasping, push/pull, use fine manipulation, and perform computer work with both hands. Dr. Chalifour referenced Dr. Bald's independent medical exam on June 14, 2012 for diagnoses and recommendations.[104]

---

[101] A.R. 1086–97.

[102] A.R. 982–83, 1052–53, 1080–83, 1176–77, 1179, 1181, 1183.

[103] A.R. 981, 1051, 1073, 1076, 1079, 1178, 1180, 1182.

[104] A.R. 1293.

On August 16, 2012, Dr. Chalifour opined that Ms. Gray would not be able to perform sedentary duty physical demands, conditions or activities. He stated that "[t]he severity of Ms. Gray's low back pain prevents her on occasion from sitting for prolonged periods of time." On August 22, 2012, Dr. Chalifour indicated that he was no longer treating Ms. Gray for injuries sustained during her work injury on December 29, 2011.[105]

On October 29, 2012, Ms. Gray saw Leon Chandler, M.D., at AA Spine & Pain Clinic. She reported to him that the chiropractic treatments, pain medications, facet blocks, and physical therapy had all been effective in relieving her pain. Dr. Chandler reviewed x-rays taken at the visit. These x-rays showed "rotational scoliosis of the thoracic area about T4 and mild lumbar scoliosis." Additionally, Dr. Chandler noted that "C6-7 has posterior ostyophite intruding into the foramen and is perched with extension. C5-6 is also perched." A physical exam showed a normal cervical spine and negative Spurling's test, normal appearance of the neck, scoliosis in the thoracic and lumbar spine, abnormal reflex in the upper extremities on the right side and bilaterally on the knees, an unstable gait, unsteady when standing, abnormal motor with weakness on the right and spasms in the lower back with movement, a negative straight leg test bilaterally, and able to walk heel to toe. Dr. Chandler assessed Ms. Gray with depression, headache, hip pain, low back pain, lower extremity pain, generalized pain, and muscle weakness. He prescribed Flexeril, Valium, and Norco (90 5-325mg tablets).[106]

---

[105] A.R. 1314, 1320.

[106] A.R. 1227–30.

On October 31, 2012, Ms. Gray received facet block and medial branch injections at the Alaska Spine Center.[107]

On November 26, 2012, Ms. Gray followed up with Dr. Chandler. At the appointment, Ms. Gray reported that the block injections did not decrease her pain and Norco "didn't work well, nor the Flexeril." Dr. Chandler noted that Ms. Gray presented with "low back pain that radiates down both legs bilaterally that cramp muscles that cause spasticity." He also noted that Ms. Gray reported loss of bladder and bowel functions. He noted that she may need "blood work done for further investigation" and refilled her Flexeril, Norco, and Valium prescriptions.[108]

Also on November 26, 2012, Ms. Gray applied for a disabled parking identification. Dr. Chandler indicated on the form that Ms. Gray was unable to walk two hundred feet without stopping to rest and was severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition. He indicated the disability was temporary up to a maximum of six months.[109]

On December 7, 2012, Ms. Gray visited MA Butler at PFMC. Ms. Gray reported worsening depression, but also reported that she was not taking any medication for

---

[107] A.R. 1231–34.

[108] A.R. 1336–40.

[109] A.R. 1335.

depression. She also reported "having trouble sleeping" and Ambien was "not working very well."[110]

On December 11, 2012, Dr. Chandler completed a health status form for the State of Alaska. He opined that Ms. Gray would not be able to work full or part-time, but could participate in classroom activities. He also noted that myofascial massage and physical therapy may help. He indicated that he expected the condition to limit Ms. Gray's ability to work for at least twelve months.[111]

On December 12, 2012, Dr. Chandler answered an inquiry from Liberty Dialysis regarding Ms. Gray's workers' compensation claim. Dr. Chandler opined that Ms. Gray's injury on December 29, 2011 was the substantial cause of her need for treatment and any claimed disability; he also noted that "oral medication [and] possible block therapy" would assist with pain relief.[112]

On December 20, 2012, Ms. Gray saw Dr. Chandler for a follow up visit and medication refill. Dr. Chandler's progress notes again indicated a normal cervical spine and negative Spurling's test, normal appearance of the neck, scoliosis in the thoracic and lumbar spine, abnormal reflex in the upper extremities on the right side and bilaterally on the knees, an unstable gait, unsteady when standing, abnormal motor with weakness on the right and spasms in the lower back with movement, a negative straight leg test

---

[110] A.R. 1451–52.

[111] A.R. 1330–31.

[112] A.R. 1322–24.

bilaterally, and able to walk heel to toe. Dr. Chandler again assessed Ms. Gray with depression, headache, hip pain, low back pain, lower extremity pain, generalized pain and muscle weakness. He refilled Ms. Gray's prescriptions of Flexeril, Valium, and Norco. He also prescribed ibuprofen, Lidoderm, Voltaren, and vitamin B-12 at the visit. He ordered additional steroid injections to the lumbar spine.[113]

On January 4, 2013, Ms. Gray visited Erin Smith, M.A., at PFMC for follow up on depression and a refill of her Ambien prescription. MA Smith reported that at the last visit, Ms. Gray "was prescribed Cymbalta but she is unsure if it is helping." MA Smith also reported that "[w]hen I asked how her depression has been she stated 'I don't know.'"[114]

On January 9, 2013, Ms. Gray received facet block and medial branch injections to her lumbar spine at the Alaska Spine Center.[115]

On January 21, 2013, Ms. Gray saw Dr. Chandler for a follow up visit. Dr. Chandler noted that Ms. Gray reported a "60% reduction in her pain for a couple of hours" following the recent injections, but also stated that "she has had a severe increase in pain to the point where she can barely sit or rest without her pain increasing." Ms. Gray reported that the previous injections on October 31, 2012 had "reduced her pain by 70%." Dr. Chandler did not refill her prescriptions at the visit as Ms. Gray indicated "she had enough

---

[113] A.R. 1356–60.

[114] A.R. 1450.

[115] A.R. 1370–73.

medications right now and does not need a refill at this time."[116] A drug screen taken the day of the visit showed that the Norco Ms. Gray had been prescribed most recently on December 20, 2012 was not detected in her system.[117]

On January 28, 2013, Ms. Gray visited the emergency department of Providence Alaska Medical Center with an "exacerbation of chronic back pain and worsening depression." A neurological exam was normal. On physical examination, Jessica Sotelo, M.D., observed that Ms. Gray's neck was "soft and supple with full range of motion"; her back had "diffuse tenderness over upper mid and lower back"; and she was "alert and oriented," had "[no] gross motor abnormalities," and was "ambulating with appropriate coordination." Dr. Sotelo noted that Ms. Gray seemed "to be severely depressed" and she requested that the psychiatric clinician evaluate Ms. Gray. Dr. Sotelo reported that Ms. Gray declined admission to the mental health unit at that time.[118]

On January 30, 2013, Ms. Gray had an initial mental health assessment by Lorrie Lundquist, LCSW, M. Ed., at Good Samaritan Counseling Center ("Good Samaritan"). LCSW Lundquist observed that Ms. Gray had a normal appearance, clean hygiene, normal speech, a depressed and irritable mood, labile affect, a cooperative and guarded attitude, and good cognition, insight, judgment. She was orientated x4, with logical thought process, normal perception, thought content, sleep, and appetite. LCSW

---

[116] A.R. 1377–83.

[117] A.R. 1388.

[118] A.R. 1479–84.

Lundquist assessed Ms. Gray as low to no risk of suicidal behavior. She recommended "a thorough medical psychiatric evaluation for diagnosis clarification" with pharmacological treatment and individual psychotherapy.[119]

On February 5, 2013, Ms. Gray saw Meghan Farrell, ANP, at Good Samaritan. ANP Farrell conducted a psychiatric assessment at the visit and noted that during the interview Ms. Gray "was unable to sit on the couch due to being uncomfortable and in pain." Ms. Gray presented with logical thinking and appropriate thought content. Her social judgment was good, and her vocabulary and fund of knowledge were intact. ANP Farrell reported that Ms. Gray's insight into her illness was fair. She diagnosed Ms. Gray with major depressive disorder, single episode, moderate, and assessed Ms. Gray's current GAF as 65.[120] At the visit, ANP Farrell re-initiated Cymbalta and prescribed trazodone.[121]

On February 8, 2013, Ms. Gray called Good Samaritan believing she was having a reaction to the Cymbalta. She reported feeling "jittery" with tingling in the arms. She was also very concerned about having high blood pressure.[122]

---

[119] A.R. 1551–58. There is also an unsigned treatment plan in the record recommending weekly psychotherapy sessions for four months. A.R. 1559–62.

[120] A.R. 1542–46.

[121] A.R. 1540.

[122] A.R. 1539. ANP Farrell noted that Ms. Gray reported the Fred Meyer pharmacy "dispensed the wrong medication." A.R. 1538.

On February 13, 2013, Ms. Gray received radiofrequency thermocoagulation at the Alaska Spine Center.[123]

On February 18, 2013, Ms. Gray met with LCSW Lundquist at Good Samaritan "for the first session since [the] initial mental health evaluation." LCSW Lundquist reported that at the session Ms. Gray had a "very heightened mood, anxiousness, frustrated." She also noted "[s]ome racing thoughts."[124]

On February 19, 2013, Ms. Gray attended a counseling session with ANP Farrell at Good Samaritan. ANP noted that Ms. Gray was oriented as to time, place, person, and situation; she had a cooperative attitude with good eye contact; her speech was "loud," but goal-directed and coherent; her motor skills were within normal limits; her mood was happy and anxious; and her perception, thought process, and thought content were within normal limits. ANP Farrell "encouraged [Ms. Gray] to re-initiate Cymbalta . . . [and] to initiate trazodone."[125]

On February 25, 2013, Ms. Gray followed up with Dr. Chandler. Dr. Chandler reported that Ms. Gray stated that the radiofrequency "is causing her to have severe increase [in] pain" and that she wanted to "discuss further options including a possible increase in pain medications." Dr. Chandler's treatment notes indicate that Ms. Gray's

---

[123] A.R. 1393–97.

[124] A.R. 1571.

[125] A.R. 1537.

physical exam was unchanged from the last three previous visits. He substantially increased the dosage of her Norco prescription at the visit.[126]

On February 26, 2013, Ms. Gray attended a counseling session with LCSW Lundquist and a medication review with ANP Farrell on the same date. Ms. Gray complained of pain. LCSW Lundquist reported that Ms. Gray had a cooperative attitude, but blunted affect with dysphoric mood. She also exhibited normal speech, logical thought process, and normal thought content. ANP Farrell also noted "borderline traits" and made a "guarded" prognosis "due to inability to follow medication regimen."[127]

On March 1, 2013, Ms. Gray requested and received an order from Dr. Chandler for a wheelchair "due to inability to walk far."[128]

On March 13, 2013, Ms. Gray saw Rebecca Clark, M.D., at PFMC. Ms. Gray reported elevated blood pressure levels at home. Her blood pressure at the visit was 132/102. She was given a blood pressure kit. Dr. Clark noted that Ms. Gray was to "start lisinopril" and return in one month for a blood pressure check.[129] Also on March 13, 2013,

---

[126] A.R. 1398–1402. Dr. Chandler had prescribed 90 tablets of Norco 5-325 mg each of the last three months of 2012. He prescribed 120 tablets of Norco 10-325 mg on February 25, 2013—more than twice the former dosages. A.R. 1219, 1401.

[127] A.R. 1536, 1570.

[128] A.R. 1403–04.

[129] This appears to be the first record showing Ms. Gray's use of lisinopril. Lisinopril is used to treat high blood pressure. *See* https://www.webmd.com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details (last visited August 7, 2018).

Ms. Gray saw Erin Smith, M.A., at PFMC, seeking a fentanyl prescription. She was told she needed to go through Dr. Chandler's office for that.[130]

On March 25, 2013, Ms. Gray visited Dr. Chandler for a follow up visit and medication refills. She reported her "[s]ymptoms remain the same," and she was waiting for a wheel chair from a pharmacy. Dr. Chandler recommended that Ms. Gray "try swimming."[131] He refilled the Norco prescription; the record of this visit contains no reference to Fentanyl.

At the counseling session with LCSW Lundquist on March 26, 2013, Ms. Gray presented with "bright affect" and was "[v]ery talkative about her future."[132] On the same day, ANP Farrell reported that Ms. Gray was oriented x4, cooperative, and her speech, motor skills, perception, thought processes, and thought content were within normal limits. ANP Farrell noted "Cluster B traits" and gave a "fair" prognosis.[133]

On April 4, 2013, Ms. Gray met with LCSW Lundquist. She noted that Ms. Gray was "experiencing grief process related to health decline."[134]

On April 11, 2013, LCSW Lundquist noted no significant change in Ms. Gray's mental status. She noted that Ms. Gray maintained "distortions of thought of her viability

---

[130] A.R. 1434–36.

[131] A.R. 1600–04.

[132] A.R. 1569.

[133] A.R. 1535.

[134] A.R. 1568.

to engage in purposeful work" and that LCSW Lundquist offered "some challenge to distortions of thought related to accurate versus inaccurate limitations" at the session.[135]

On April 18, 2013, Ms. Gray attended a counseling session with LCSW Lundquist. She noted no significant change in Ms. Gray's mental status. She reported that Ms. Gray presented as "agitated, [with] depressed effect."[136]

On April 23, 2013, Ms. Gray saw Jane Sonnenburg, PA-C, at AA Spine & Pain Clinic, for follow up and medication refills. In the treatment notes, Ms. Gray's physical exam was unchanged from previous visits. PA Sonnenburg noted that Ms. Gray reported "constant, sharp, shooting, stabbing, burning, throbbing and aching" pain in the lower back and hips. She also noted that Ms. Gray reported medication, heat, and ice help the pain. PA Sonnenburg refilled Ms. Gray's prescriptions for gabapentin, Flexeril, Norco, and Valium.[137]

On May 1, 2013, Ms. Gray saw Heather Bell, PT, ATP, at Providence Sports Medicine and Rehabilitation Therapies for a wheelchair assessment. PT Bell noted that Ms. Gray "presented to the appointment using a single-point cane." She also noted that Ms. Gray "was able to move all extremities against gravity." PT Bell also "[o]bserved functional strength is 4-/5 throughout," and that Ms. Gray's range of motion was "[w]ithin functional limits in all extremities." At the visit, PT Bell determined that "a four-wheeled

---

[135] A.R. 1567.

[136] A.R. 1566.

[137] A.R. 1605–09.

walker for home mobility and a power scooter for community access are the most reasonable and cost-effective options to meet her needs."[138]

On May 3, 2013, Ms. Gray saw ANP Farrell. Ms. Gray reported, "I think I'm broken." ANP Farrell noted a depressed mood, but "brighter affect towards end of session." She noted Cluster B traits. Her prognosis was fair and guarded.[139]

On May 16, 2013, Ms. Gray saw Dr. Chythlook, M.D., at PFMC, for follow up on high blood pressure and "social security paperwork." Her blood pressure was 150/100 at that visit.[140]

On May 21, 2013, Ms. Gray saw Dr. Chandler for medication refills. She reported "feeling more pain on more days and thinks maybe her current treatment plan is sub-optimal." Dr. Chandler refilled her Norco and Valium prescriptions.[141]

On June 5, 2013, Ms. Gray visited Deborah Green, R.N., at PFMC, for a blood pressure check, which was 120/86 that day. RN Green noted Ms. Gray disclosed "rather random medication dosing and gives long inconsistent answers about her use of prn meds including phenergen, cyclobenzaprine, zaleplon, and hydrocodone/acetaminophen." RN Green also noted that Ms. Gray reported that she had

---

[138] A.R. 1664–67.

[139] A.R. 1534.

[140] A.R. 1594–96. Dr. Chythlook noted that Ms. Gray had been taking Lisinopril 10 mg, but had "not been regularly checking [blood pressure] at home." He increased her dosage to 20 mg. A.R. 1594–95.

[141] A.R. 1610–14.

not "increased her dose of lisinopril from 10 mg to 20 mg as instructed at her [May 16, 2013] appointment."[142]

On June 6, 2013, Ms. Gray saw LCSW Lundquist. She noted that Ms. Gray had an "agitated, depressed affect" and that she presented "somewhat labial today but engaged well."[143] On the same day, Ms. Gray saw William Chythlook, M.D., at the emergency department at Providence for numbness of the face and chronic back pain. Dr. Chythlook did not recommend brain imaging or further neurological workup at the visit.[144]

On June 12, 2013, Ms. Gray had a physical work performance evaluation by Kathryn Kerris, O.T., at Providence Sports Medicine & Rehabilitation Therapies. OT Kerris concluded that Ms. Gray would be able to perform sedentary work for an 8-hour day/40-hour week and that she could exert "up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently." "Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." OT Kerris noted that Ms. Gray "self-limited on 12% of the 17 tasks" and "if the self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting test results." She also noted that Ms. Gray "has a high degree of unresolved pain" and that "she struggles to do daily

---

[142] A.R. 1592–93.

[143] A.R. 1565.

[144] A.R. 1485–89. While in the emergency department, Ms. Gray reported starting on lisinopril 10 mg one month prior. Ms. Gray reported that her blood pressure was 150/98 at a medical visit on June 5, 2013 "so her Lisinopril dose was increased to 20 mg." A.R. 1484.

living skills, her walking speed is very slow and she has had multiple falls." OT Kerris added, "[s]he will need a good ergonomic workstation if and when she goes back to work, which is adjustable and has good arm support."[145]

On June 13, 2013, Ms. Gray attended a counseling session with LCSW Lundquist. She noted that Ms. Gray presented "somewhat labial today in mood but engaged well." That same day, Ms. Gray saw ANP Farrell for medication review. ANP Farrell reported that Ms. Gray had a normal appearance, orientation, memory, attention and concentration, and thought content, but abnormal mood, affect, and speech.[146]

On June 14, 2013, Ms. Gray saw Bruck Clift, M.D., at PFMC, for follow up after going to the emergency department on June 6, 2013. Dr. Clift noted that Ms. Gray's diastolic blood pressure had been elevated since earlier in the year. At the visit, her blood pressure was 120/86. Ms. Gray reported continuing with the increased dose of lisinopril 20 mg since the emergency department visit.[147]

On June 18, 2013, Ms. Gray saw Dr. Chandler for a follow up visit and medication refill. Dr. Chandler wrote, Ms. Gray "has scoliosis but no othe[r] diagnosis."[148]

---

[145] A.R. 1465–74.

[146] A.R. 1532, 1564.

[147] A.R. 1592–93.

[148] A.R. 1615–19.

On June 27, 2013, Ms. Gray attended a counseling session with LCSW Lundquist. She noted that Ms. Gray presented "somewhat labial today in mood but engaged well."[149]

On July 1, 2013, Ms. Gray went to PFMC for a blood pressure check and social security paperwork. Her blood pressure was 102/72 at that visit. She reported increased pain in the "mid-back and down into the legs" at the visit.[150]

On July 2, 2013, Rachel Samuelson, M.D., a family practitioner, conducted a physical capacity evaluation of Ms. Gray. She opined that Ms. Gray could lift five and ten pounds occasionally, reach frequently, bend occasionally, and never squat or climb. She opined that Ms. Gray could sit frequently for a total of 2-4 hours, stand up to 33% continuously for a total of 2 hours, and walk up to 33% continuously, all with breaks, in an 8-hour work day. Dr. Samuelson indicated that Ms. Gray's medications moderately restricted her ability to drive, but that she was physically able to travel by bus. Dr. Samuelson also stated that Ms. Gray "has pain, though there is no clear medical explanation for this pain." Her prognosis was "unclear at this point."[151]

On August 5, 2013, Kenneth Pervier, M.D., a neurologist, evaluated Ms. Gray. He noted that Ms. Gray "had no indication of pain while sitting quietly for the better part of 20 minutes before she even shifted once on a hard wooden chair." He also noted that she was "[a]lert, oriented to person, place, date and time" and "had a smiling, very active

---

[149] A.R. 1563.

[150] A.R. 1590–91.

[151] A.R. 1524–28.

disposition, despite a problem of constant pain for years." He noted "decreased effort on the motor exam in all four extremities" and a "negative straight leg raising test while sitting." Yet Ms. Gray "had exquisite pain to almost fingertip pressure touching along the paraspinal musculature anywhere from the neck down to the sacral region, and she would jerk [to] pain jolts that she felt when being touched." Dr. Pervier opined that "[t]his level of stimulus should not have caused pain whatsoever in this patient's case." He remarked that Ms. Gray "had no difficulty . . . bending over grossly while sitting at the waist, over her knees, in order to reach down and put her shoes and socks back on; this is a bit inconsistent and the patient showed no pain manifestations in the face or otherwise, or checking motions secondary to any pain while she was doing this." Dr. Pervier noted that "without question [Ms. Gray's chronic pain] has a nonorganic factor to it." He recommended that "she continue with pain management with a psychiatrist or psychologist who deals with chronic conversion-type symptomatology and symptom augmentation symptomatology involved in her case chronically as well."[152]

On August 13, 2013, ANP Farrell completed a health status questionnaire. In it, she diagnosed Ms. Gray with major depressive disorder, mild and chronic pain. ANP Farrell opined that Ms. Gray's medical conditions prevent her from working either full or part time. She indicated that Ms. Gray's inability to work would be expected to continue for six months or more. ANP Farrell noted that Ms. Gray's medications cause side effects

---

[152] A.R. 1500–1502.

impacting her ability to work, including "sedation, dizziness, and [reduced] concentration." ANP Farrell recommended physical therapy and a pain management consultation.[153]

On August 26, 2013, ANP Farrell completed a second questionnaire regarding Ms. Gray's mental ability to do work-related activities. She indicated that Ms. Gray's ability to understand and remember simple and complex instructions, make judgments on simple and complex work-related decisions, and carry out complex instructions, were mildly affected by her mental impairment. ANP Farrell noted that "at times [Ms. Gray] is forgetful due to medication side effects" and that she "is experiencing daily fatigue due to insomnia."[154]

Also on August 26, 2013, Ms. Gray saw Dr. Chandler for a follow up visit. He reported that Ms. Gray "states her leg spasms are becoming more frequent and her feet are starting to get a 'tingly' feeling." Ms. Gray inquired about a possible increase in her medications. Dr. Chandler refilled her Ambien, diazepam, Flexeril, gabapentin, Ibuprofen, Norco, Phenergan, and Valium, with no change. He added a topical compound cream treatment.[155]

On August 27, 2013, Ms. Gray applied for a permanent disabled parking identification. Marta Lasater, M.D., completed the physician portion of the permit application. Dr. Lasater opined that Ms. Gray was unable to walk two hundred feet without

---

[153] A.R. 1529–31.

[154] A.R. 1575–77.

[155] A.R. 1620–24.

stopping to rest, was unable to walk without the use of an assistive device, and was severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition; she opined the disability was permanent.[156]

On August 28, 2013, Ms. Gray saw Tom Grissom, M.D., at the Algone Institute, for a second opinion regarding her low back pain. Upon examination, he reported Ms. Gray showed "5/5 normal muscle strength" in the bilateral lower extremities and a "broad-based and waddling" gait. Dr. Grissom reported that Ms. Gray was "[o]riented x3 with appropriate mood and affect and able to articulate well with normal speech/language, rate, volume and coherence." He diagnosed Ms. Gray with degenerative joint disease of the spinal facet joint and recommended a discogram. Dr. Grissom also ordered an MRI and x-rays of the lumbar spine.[157] He did not prescribe any medications at that visit.

On September 24, 2013, Ms. Gray saw Dr. Chandler for follow up and medication refills. Ms. Gray reported pain that was "sharp, shooting, stabbing, burning, aching, pinching, and throbbing." She indicated that the pain was "generally made worse by bending, lifting, standing, sitting, walking, climbing stairs, straining, and driving." He refilled the Norco prescription; however, the toxicology report from the visit did not detect any Norco in Ms. Gray's system. He recommended that Ms. Gray discuss with Dr. Grissom if she should take a transdermal patch for pain relief.[158]

---

[156] A.R. 1725.

[157] A.R.1581–83.

[158] A.R. 1625–31, 2023–24.

On September 25, 2013, Ms. Gray saw ANP Farrell. ANP Farrell reported that Ms. Gray had abnormal attention and concentration and insight and judgment, but normal orientation, memory, language, mood, affect, speech, thought processes, and thought content. ANP Farrell also noted that Ms. Gray "did not mention pain during this session."[159]

On September 30, 2013, Ms. Gray underwent "[l]umbar spine CT post discography" with Dr. Grissom. The examiner reported "[n]o disc degeneration, protrusion . . . [n]o annular tear" at L3-L4, "grade 1 disc degeneration at L4-L5," and "[g]rade 1 disc degeneration with subtle annular bulge at L5-S1. No discrete disc bulge or annular tear is apparent." Dr. Grissom prescribed 11 Fentanyl patches (25mcg/hr) to Ms. Gray for the next 30 days.[160] He did not prescribe any Norco.

On October 14, 2013, Ms. Gray saw Dr. Grissom for follow up after the lumbar discogram. Ms. Gray reported pain "exacerbated for about a week after the procedure." Upon examination, Ms. Gray exhibited normal 5/5 muscle strength in the bilateral lower extremities, a normal gait, "pain with lumbar lateral bending, pain with lumbar rotation and pain with facet maneuvers." She was oriented x3 with "appropriate mood and affect and able to articulate well with normal speech/language, rate, volume and coherence." Dr.

---

[159] A.R. 1598.

[160] A.R. 1579–80, 1699–70.

Grissom prescribed 30 more Fentanyl patches at an increased dosage (50mcg/hr). He also recommended that Ms. Gray undergo an endoscopic discectomy procedure.[161]

On November 11, 2013, Cheryl Fitzgerald, PA-C, from Algone, completed a health status report form for Ms. Gray. She identified Ms. Gray's diagnoses as degenerative disc disease, lumbar and cervical, and chronic lumbar radiculopathy. PA Fitzgerald indicated that Ms. Gray would not be able to work full time or part time for six months. She also opined that Ms. Gray's medications caused drowsiness. She recommended pain management, physical therapy, a possible spinal cord stimulator, and a functional assessment.[162] PA Fitzgerald ordered physical therapy "for core strengthening and water therapy."[163]

On December 6, 2013, Ms. Gray saw PA Fitzgerald at Algone for a follow up exam and medication refill. On examination, Ms. Gray's muscle strength and gait were normal.[164] PA Fitzgerald prescribed 150 Norco tablets (10-325mg) for Ms. Gray on that date; she also filled her Fentanyl prescription, 11 patches at 50mcgg/hr.

On December 27, 2013, Ms. Gray saw PA Fitzgerald. Ms. Gray reported lower back pain. She reported increased pain with "prolonged sitting, transitioning from sitting

---

[161] A.R. 1646–47.

[162] A.R. 1661–62.

[163] A.R. 1733. There is no evidence in the record of physical therapy following the November 11, 2013 appointment.

[164] A.R. 1645.

to standing, and standing," but relief "somewhat with changes in position and medication." PA Fitzgerald noted that Ms. Gray ambulated "with use of a four-wheeled walker slow and cautiously." PA Fitzgerald diagnosed Ms. Gray with high risk medication use, neck pain, degenerative joint disease of the spinal facet joint, chronic lumbar radiculopathy, low back pain, and carpal tunnel syndrome of the left wrist. Ms. Gray reported the Fentanyl does not seem to be working as well for the past month. PA Fitzgerald increased Ms. Gray's Fentanyl dosage from 50 to 75 mcg and prescribed 150 Norco tablets (10-325mg). A drug screen was ordered but its results are not in the record.[165]

On January 22, 2014, Ms. Gray saw Dr. Grissom. He performed "L4-5 and L5-S1 left-sided endoscopic discectomy under fluoroscopic and direct visualization." He refilled the Norco and Fentanyl prescriptions.[166]

On January 29, 2014, Ms. Gray saw Briana Cranmer, M.D., at PFMC. Dr. Cranmer assessed Ms. Gray with bilateral lower extremity edema. At the visit, Dr. Cranmer observed that Ms. Gray was not in "acute distress but appears uncomfortable," that she was ambulating with difficulty, alert and oriented, but with "flattened affect, tearful." Ms. Gray reported that she was "concerned that she has hit the 200 lb mark" and that she "eats even when she's not hungry."[167]

---

[165] A.R. 1640–41.

[166] A.R. 1632–33, 1826–27.

[167] A.R. 1585–89.

On February 12, 2014, Ms. Gray visited Dr. Grissom for a follow up exam. She reported "that she has not noticed any changes in her pain and states she still has days where moving around is not an option but she is hopeful." She also reported that "[p]ain increased with prolonged sitting, transitioning from sitting to standing, and standing," that the pain was relieved "somewhat with changes in position and medication," and "Norco offers relief in conjunction with [the] Fentanyl patch." Dr. Grissom increased the strength of the Fentanyl patches to over 100 mcg/hr. He also prescribed 150 Norco tablets (10-325mg).[168] On the same date, Dr. Grissom wrote a letter stating that Ms. Gray "continues to have ongoing issues with her lumbar discs which originated 12/2011" and that "it is unclear when/if she'll be able to return to work."[169]

On February 17, 2014, Ms. Gray saw Dr. Samuelson at PFMC for follow up. Ms. Gray reported continued leg swelling and "sometimes her hands as well," and reported that the "palms of her hands and soles of her feet are tingly and painful." Dr. Samuelson assessed Ms. Gray with "[e]xtremity edema, with tingling [in] the soles and palms," but noted that it was "[u]nclear what this is due to."[170]

---

[168] A.R. 1704–06. He prescribed 7 patches of 25mcg/hr for the next 18 days and 11 patches of 100mcg/hr for the next 30 days.

[169] A.R. 1637.

[170] A.R. 2069–71.

On February 18, 2014, Ms. Gray received a bilateral lower extremity deep vein thrombosis study. The study showed "no right or left lower extremity deep vein thrombosis."[171]

On March 6, 2014, Ms. Gray saw PA Fitzgerald for a follow up exam and prescription refill. Upon examination, Ms. Gray showed "5/5 normal muscle strength" in the bilateral lower extremities, a normal gait, and "2+ pitting edema to the knee." PA Fitzgerald reported that Ms. Gray was "[c]ooperative and in no apparent distress" and "[o]riented x3 with appropriate mood and affect and able to articulate well with normal speech/language, volume and coherence." PA Fitzgerald diagnosed Ms. Gray with low back pain, chronic lumbar radiculopathy, peripheral edema, and long-term current use of opiate analgesic. She prescribed 150 Norco tablets (10-325 mg) and 11 patches of Fentanyl at 100mcgy/hr.[172]

On April 1, 2014, Ms. Gray returned to PA Fitzgerald at Algone for medication refills. She also reported lower back pain and neck pain. PA Fitzgerald observed that Ms. Gray had "normal posture" and used a walker. Ms. Gray was alert and oriented x3 "with appropriate mood and affect." Ms. Gray reported that opioid therapy was helpful, but that "she has not had any kind of relief" from endoscopic microdiscetomy. PA Fitzgerald opined that Ms. Gray's "symptoms are consistent with neuropathic pain." OxyContin and

---

[171] A.R. 2091.

[172] A.R. 1694–96.

oxycodone were both prescribed at this visit, but not fentanyl. PA Fitzgerald also referred Ms. Gray to four to six weeks of physical therapy, 3 sessions a week.[173]

On April 14, 2014, Ms. Gray visited PA Fitzgerald for medications follow up. Ms. Gray reported that "[a]fter her last visit she 'got tired of taking pills' so went off all of her medications 'cold turkey,'" but that she was "back on the medications and is feeling better." Her edema had resolved.[174]

On April 17, 2014, Ms. Gray saw Amy Hoger, PA, at PFMC. Ms. Gray reported "[n]umbness in [the] hands" and bottom of the feet for several months, her fingers were "not working at times," and that she has to "stop eating due to trouble with finger movement," but that she was not seeing a neurologist, had no recent injury, and had no other new symptoms. Upon examination, PA Hoger observed that Ms. Gray had a normal affect and speech pattern, answered questions appropriately, was able to follow two step commands, and was resting calmly at the visit. She noted that, with encouragement, Ms. Gray had normal range of motion and strength bilaterally in her upper and lower extremities.[175]

On April 29, 2014, Ms. Gray saw PA Fitzgerald. She reported lower back pain and carpal tunnel syndrome, including hand tingling and numbness. PA Fitzgerald observed that Ms. Gray was alert, "cooperative and in no apparent distress," able to "articulate well

---

[173] A.R. 1753–58, 1723–24. There is no record of physical therapy after this order until June 2014.

[174] A.R. 1688–90.

[175] A.R. 2072–73.

with normal speech/language, rate, volume and coherence," with appropriate mood and affect, and "[o]riented x 3." Regarding Ms. Gray's hands, PA Fitzgerald noted no redness, edema, or deformity, no "thenar eminence atrophy," with a "[d]ecreased grip on right compared to left." PA Fitzgerald prescribed 150 Norco tables (10-325mg) and 11 patches of fentanyl (100mgc/hr). She also wrote a prescription for "cockup splints" to wear at night "until she sees the neurologist for nerve conduction studies."[176] The record also indicates a plan for a drug screen, but there are no such screening results in the record.

On May 27, 2014, Ms. Gray saw Matthew Peterson, M.D., at Algone, for medication refills of the Norco tablets and fentanyl patches. He noted that he was "[u]ncertain of [the] source of pain" and that Ms. Gray "continued to have both low back and bilateral leg pain with leg weakness to the point she uses a walker."[177] That same date, PA Fitzgerald completed a health status form. She indicated that Ms. Gray was unable to work full time or part time for twelve months. PA Fitzgerald wrote that Ms. Gray should "continue physical therapy twice a week, continue pain management," and obtain a functional assessment.[178]

Beginning June 5, 2014, Ms. Gray attended physical therapy sessions at East Side Physical Therapy.[179]

---

[176] A.R. 1707–09.

[177] A.R. 1721–22.

[178] A.R. 1710–11.

[179] A.R. 1728. The record shows that Ms. Gray attended physical therapy sessions on June 5, 9, 18, 23, 25, 30, and July 2, 7, and 9, 2014. She canceled appointments on December 11, 2013

On June 18, 2014, Ms. Gray saw Dr. Peterson for a follow up. She reported increased pain due to a fall. Her physical and neuropsychiatric exams were similar to previous visits at Algone.[180] Dr. Peterson again noted that he was uncertain of the source of Ms. Gray's pain. He also noted "[n]o aberrant behavior." He started Ms. Gray on Percocet in place of the Norco, and continued the fentanyl.[181]

On July 25, 2014, Dr. Grissom inserted a "[d]ual-lead spinal cord stimulator trial utilizing a Boston Scientific system."[182]

On July 30, 2014, Ms. Gray saw Dr. Ellenson for a neurological evaluation. Dr. Ellenson diagnosed carpal tunnel syndrome and noted that Ms. Gray's "examination was normal except for her painful gait and persistent back pain. Nerve conduction studies reveal mild bilateral carpal tunnel syndrome worse on the right."[183]

On August 1, 2014, Ms. Gray followed up with Dr. Peterson at Algone to have her spinal cord stimulator leads "looked at and re-dressed." He discontinued the Percocet and prescribed 28 tablets of oxycodone (20mg) with no refills.[184]

---

and on May 20, June 11 and 16, 2014.

[180] At multiple visits, providers at Algone observed that Ms. Gray was alert and cooperative, able to "articulate well with normal speech/language, rate, volume and coherence," with appropriate mood and affect, and "[o]riented x 3."

[181] A.R. 1718–20.

[182] A.R. 1734–35.

[183] A.R. 2095–2100.

[184] A.R. 1772–74.

On August 4, 2014, Ms. Gray followed up at Algone. The spinal cord stimulator was removed and her oxycodone prescription was refilled for fourteen more days.[185]

On August 26, 2014, Ms. Gray visited Dr. Grissom. She reported that her "current [opioid] regimen has been effective," but that her pain that day was a "10." She queried whether "she might get a little bit more relief in her pain scales if she changes the [Fentanyl] patch every 48 hours." Dr. Grissom observed normal coordination, a normal gait "using [a] walker," no edema, a normal bilateral peripheral vascular lower extremity inspection, normal attention span, concentration, speech/language, rate, volume and coherence, and appropriate mood and affect. He diagnosed her with degenerative joint disease of the spinal facet joint, arthritis, carpal tunnel syndrome of the left wrist, peripheral edema, bulge of lumbar disc without myelopathy, neck pain, chronic lumbar radiculopathy, low back pain, long-term use of opiate analgesic, and narcotic withdrawal. He ordered a rheumatology panel, changed the Fentanyl prescription to 1 patch every 48 hours, and prescribed 90 more 20 mg tablets of oxycodone for 30 days.[186]

On August 29, 2014, Ms. Gray had an MRI of her cervical spine. The MRI showed "C6-C7 left foraminal and extraforaminal disc protrusion and osteophyte formation resulting in severe stenosis of the left subarticular zone and left neural foramen," and "C7-

---

[185] A.R. 1850–52.

[186] A.R. 1853–57.

T1 small right foraminal disk protrusion contributing to mild foraminal stenosis," and "reversal of cervical lordosis."[187]

On September 19, 2014, Ms. Gray saw Dr. Peterson at Algone. He added a diagnosis of cervical radiculopathy after reviewing the MRI results from August 29, 2014. He prescribed an additional 90 tablets of 20 mg of oxycodone and 15 more 100 mcg/hr Fentanyl patches for the next 30 days.[188]

On October 21, 2014, Ms. Gray saw Dr. Grissom for a "recheck of chronic opioid management. He reported that Ms. Gray was "very emotional today and in a lot of pain." He also reported that the "current regimen has been effective." Ms. Gray reported her insurance could only cover the Fentanyl patches every 56 hours, not the 48 hours prescribed. He refilled the Fentanyl at 15 patches for 30 days and 90 tablets of 20 mg oxycodone for 30 days.[189]

On November 19, 2014, Ms. Gray saw Dr. Peterson at Algone for medication refills.[190]

On November 24, 2014, Ms. Gray saw Claire Stoltz, M.D., at PFMC, for left hip, groin, and buttock pain that she reported had radiated down her leg for the past three days. Dr. Stoltz noted that Ms. Gray's reported left groin pain was of "unclear etiology at

---

[187] A.R. 1736–37.

[188] A.R. 1858–62.

[189] A.R. 1863–66.

[190] A.R. 1867–70.

this time given her concurrent and complex back pain." She also noted that Ms. Gray was anxious and frustrated, "occasionally tearful," and in "moderate distress" during the visit. She noted that Ms. Gray was "currently on fentanyl patches and is planning on restarting gabapentin and methadone after tapering the fentanyl[l]." Dr. Stoltz reported that she informed Ms. Gray that she needed to involve her chronic pain doctor as "[w]e should not be adjusting her pain meds."[191] Also on November 24, 2014, Ms. Gray had an x-ray of her left hip. The x-ray showed "[n]ormal radiographic appearance of the hip," that the "hip is anatomically aligned and has normal morphology," and the soft tissues "are normal."[192]

On December 2, 2014, Ms. Gray visited Zachary Kile, PA-C, at Algone. She reported increased pain. Upon examination, PA Kile noted that Ms. Gray had good, pain-free range of motion of the bilateral hips with internal/external rotation, mild pain to palpation of the GT Bursa, and "NV intact with negative Homan's sign."[193]

On December 10, 2014 and January 7, 2015, Ms. Gray visited PA Kile. He refilled and adjusted medications. He indicated that Ms. Gray was at "low risk for opiate abuse."[194]

---

[191] A.R. 2074–76.

[192] A.R. 2092.

[193] A.R. 1871–74.

[194] A.R. 1875–78, 1879–82. At each of these visits, PA Kile prescribed 4 Methadone tablets per day(10mg) as well as 3 Oxycodone tablets per day(20mg); there is no reference to Fentanyl.

On February 3, 2015, Ms. Gray saw Dr. Grissom for medication refills. He refilled the Oxycodone prescription and added 2 MS Contin tablets a day (30 mg). He added piriformis syndrome to her list of diagnoses.[195]

On March 4, April 1, April 27, and May 26, 2015, Ms. Gray saw care providers at Algone for medication refills and adjustments.[196]

On June 4, 2015, Dr. Grissom completed a health status report form for the State of Alaska based on his May 26, 2015 examination of Ms. Gray. He listed Ms. Gray's diagnoses as chronic lumbar radiculopathy, polyarthralgia, degenerative joint disease of the spinal facet joint, carpal tunnel left wrist, and cervical radiculopathy. Dr. Grissom opined that Ms. Gray could not work full time or part time. He specified that medication side effects may cause sedation/impaired mentation, dizziness, and vomiting that may impact Ms. Gray's ability to participate in a work or training environment.[197]

On June 29, 2015, Ms. Gray saw Jenny Uphus, LPN, at Algone. LPN Uphus noted that Ms. Gray "is receiving opioids for neck pain, back pain, and fibromyalgia." She also noted that Ms. Gray "is having severe leg pain today and is having a hard time getting up

---

[195] A.R. 1883–87.

[196] A.R. 1759–62, 1764–67, 1888–95. On April 1, 2014, Dr. Grissom increased the MS Contin to 1 tablet a day at 60mg and refilled the Oxycodone. On April 16, 2015, PA Kile wrote a letter stating, "Due to her medical conditions, she is considered to be fully disabled." PA Kile concluded that "[c]urrently [Ms. Gray] is unable to manage her pain with the use of interventional procedures listed above and her pain is not well managed with her current opioid treatment." A.R. 1763. On May 26, 2015, Dr. Grissom increased the MS Contin to 3 tablets a day at 60 mg and refilled the Oxycodone. A.R. 1746-47.

[197] A.R. 1741–44.

and walking." LPN Uphus refilled the Oxycodone prescription and refilled the MS Contin prescription of 3 tablets a day (60mg). She also ordered massage therapy.[198]

On July 14, 2015 and August 5, 2015, Ms. Gray saw Pebbles Shanley, M.D., at PFMC. Dr. Shanley reviewed "significant medical, surgical, social history, medications and allergies" at the visit. She also discussed fibromyalgia with Ms. Gray, noting "this is a new diagnosis from her pain management clinic."[199]

On July 28, 2015, Ms. Gray visited Dr. Grissom. At the visit, Ms. Gray denied "any improvement in pain." Dr. Grissom refilled Ms. Gray's opioid medications.[200]

On August 20, 2015, Ms. Gray saw Dr. Grissom for medication refills. She reported at this visit that her "current [opioid] regimen has been adequate."[201]

On October 29, 2015, Ms. Gray followed up at Algone. She reported that her "current [opioid] regimen has been adequate and ineffective." Her dosage of MS Contin was reduced to 1 tablet/day of 30 mg.[202]

On December 16, 2015, Ms. Gray had an x-ray of her lumbar spine. The x-ray showed the "[l]umbar vertebral bodies are anatomically aligned, vertebral body heights are normal, and there are no fractures seen." In comparison to the January 2012 x-ray,

---

[198] A.R. 1768–71.

[199] A.R. 2077–81.

[200] A.R. 1775–78.

[201] A.R. 1779–81.

[202] A.R. 1782–83. The record from this visit appears to be incomplete.

"no new acute appearing bony changes [were] seen." The x-ray also showed that the invertebral disc spaces were normal, pars interarticularis intact, no suspicious osteolytic or biastic lesions, and the visualized soft tissues appeared normal.[203]

On December 22, 2015, Dr. Grissom wrote a letter opining that Ms. Gray "is fully disabled." He explained she "is unable to manage her pain with the use of interventional procedures" and that her pain "is not well managed with her current opioid treatment." He also reported that she is unable to physically work and is limited in her physical capabilities. She cannot walk long distances, sit for a prolonged time, manipulate stairs, lift, bend, or drive a motor vehicle.[204]

On January 7, 2016, Ms. Gray saw Dr. Shanley at PFMC for "daily headaches." Dr. Shanley diagnosed her with "chronic migraine without aura without status migrainosus, not intractable."[205]

On January 14, 2016, Ms. Gray saw PA Fitzgerald. PA Fitzgerald reviewed the lumbar spine x-rays "which were read out as normal." Strength testing of the lower extremities was 5/5 and equal bilaterally. Ms. Gray had normal posture, affect, speech, thought content, and perception. PA Fitzgerald diagnosed Ms. Gray with chronic lumbar

---

[203] A.R. 1917.

[204] A.R. 1923.

[205] A.R. 1936–40, 2081–82.

radiculopathy, facet arthopathy, and long term current use of opiate analgesic. She adjusted and refilled Ms. Gray's medications at the visit.[206]

On February 24, 2016, Ms. Gray saw David Penn, M.D., at PFMC, for daily headaches with "[m]igraine-like . . . sensitivity to light and sound."[207]

On March 4, 2016, Ms. Gray received a cervical medial branch block at C3-C6 on the right.[208]

On March 15, 2016, Ms. Gray visited PA Fitzgerald. She stated MS Contin "does not work at all and is a waste of money and time." She denied any improvement in pain from the recent medial branch block at C3–6. PA Fitzgerald noted that the new MRI showed mild degenerative changes at L3-4 with a left paracentral disc protrusion causing mild left foraminal stenosis and progression of degenerative changes at L4-5. PA Fitzgerald noted there was "[n]othing that really explains all of her pain." Ms. Gray stated that she "does not feel like the morphine is helping with her pain." PA Fitzgerald "[d]iscussed that [Ms. Gray's] pain medications could be exacerbating her pain"; accordingly, PA Fitzgerald reduced the MS Contin prescription. [209]

---

[206] A.R. 1944–48. There may be some missing records. The prescription includes 3 tablets/day of Oxycodone (20mg) and 3 tablets a day of MS Contin (60 mg), the higher amount previously prescribed to Ms. Gray.

[207] A.R. 1949–51, 2084–85.

[208] A.R. 1952–53.

[209] A.R. 1957–62. The record has conflicting start dates for morphine sulfate 60 mg. However, the record does not show a prescription for morphine before March 22, 2016. A.R. 1951, 1960, 2034, 2102.

On March 30, 2016, Ms. Gray saw Chelsey Jacobs, PA-C, at PFMC, for chronic headaches. PA Jacobs reported that Ms. Gray was interested in being referred for counseling and that she had stopped taking trazodone for insomnia over one month before the appointment. PA Jacobs diagnosed Ms. Gray with chronic intractable headache, unspecified; insomnia, unspecified; depression; and other chronic pain.[210]

On April 6, 2016, Ms. Gray followed up with PA Jacobs. PA Jacobs adjusted her medications at the visit.[211]

On April 11, 2016, Ms. Gray saw Dr. Ellenson at Alaska Neurology Center. He noted that she reported daily headaches, but that "[h]er examination shows a painful appearing gait and (sic) but is otherwise normal." Dr. Ellenson reported that he "explained the concept of medication overuse headaches" and wrote he was "optimistic her migraines will improve with the combination of topiramate and discontinuation of pain medication."[212]

On April 15, 2016, Dr. Grissom wrote a letter opining that Ms. Gray "is unable to manage her pain with the use of interventional procedures only."[213]

---

[210] A.R. 2085–89.

[211] A.R. 2089.

[212] A.R. 2101-05.

[213] A.R. 1954–56.

On June 9, 2016, Ms. Gray saw PA Fitzgerald for medication adjustments and refills. The morphine was discontinued and replaced with 60 tablets of Opana ER 15 mg, another opioid pain medication.[214]

On July 26, 2016, Ms. Gray visited Dr. Shanley at PFMC for headaches and a neuropsychological referral. Ms. Gray reported having "depressed mood, anxiety symptoms as well as memory difficulty and decreased concentration."[215]

On August 2, 2016, Ms. Gray followed up with Dr. Ellenson to adjust her medications for daily headaches.[216]

On August 18, 2016, Ms. Gray saw Russell Cherry, PsyD, for a neuropsychological evaluation. Dr. Cherry conducted an interview with Ms. Gray and performed a battery of academic, mood, behavior, and adaptive behavior tests. Ms. Gray "did not list medications and had difficulty recalling them, with the exception of amitriptyline." She presented as "tired and possibly sedated/groggy." She reported panic attacks and severe depression, significant agoraphobia, and a marked change in personality and mood, all arising after her 2011 injury. Dr. Cherry noted that the test findings "are considered only marginally valid due to the patient failing two different internal validity checks indicating invalid performance, as well as due to her failing two brief screening measures of effort/motivation, where she performed below adults with mild dementia or mental

---

[214] A.R. 2028–37.

[215] A.R. 2089.

[216] A.R. 2106–10.

retardation, which is implausible." He noted Ms. Gray's "extreme overreporting of implausible cognitive/neurological symptoms." Dr. Cherry diagnosed Ms. Gray with major depressive disorder, recurrent and severe; Posttraumatic Stress Disorder ("PTSD"); anxiety, unspecified; and adverse medication effects. He provisionally diagnosed Ms. Gray with bipolar disorder, not elsewhere classified ("NEC"); and somatoform disorder, NEC. Specifically, Dr. Cherry noted "[w]ith regard to provisional diagnosis of Somatoform Disorder NEC, the referral source questioned somatic health issues." He also noted the "numerous technically invalid and implausibly low scores on neuropsychological testing is common to somatoform populations, the patient's responses on psychological testing were prototypical for diagnosis of somatoform disorder, and the patient's history of significant abuse and depression and varied anxiety would greatly predispose her toward somatic expression of stress/depression/anxiety." He noted that Ms. Gray "is receiving far too many sedating medications" and in his opinion, "the pain center where [Ms. Gray] is being seen has a tendency for over-sedating patients." He recommended the ongoing receipt of social security and related services, resumption of individual therapy, and consultation with an attorney regarding qualification for additional benefits due to her 2011 work accident. Dr. Cherry also recommended working with a physical therapist on chronic pain and sleep accommodations, reviewing sedating medications, receiving housing assistance and a service animal, participation in a chronic pain group, future participation

in a PTSD support group or anxiety group, and reviewing the need for a repeat sleep study "if sedating medications can be reduced in the future."[217]

*Hearing Testimony on September 26, 2016*

Ms. Gray attended the September 26, 2016 hearing with her attorney, Christopher Dellert. She testified that she was "unable to walk unassisted" because of leg weakness. She explained that the radiographic ablation procedure, discogram, microdiscectomy, multiple injections, spinal cord stimulator, physical therapy, and chiropractic treatments had not resulted in any kind of long-term improvement, and in fact her pain had increased in the years following her 2011 injury. She testified that at the time of the hearing her only treatment was pain medications and that these were "somewhat effective." She testified that she could not sit or stand for long periods of time due to pain. She testified that she could do "[r]egular personal hygiene things; set up; laundry; vacuum; light duty housework; mainly sit up, sit up in the house because I end up having to do a lot of laying," but after performing light duty housework or "normal stuff," she was "in tremendous pain, for the next day or two."[218]

---

[217] A.R. 2111–127.

[218] A.R. 71–75. Ms. Gray's initial hearing was July 9, 2013. She testified without a representative. She provided similar testimony to the September 26, 2016 hearing regarding her back pain. She testified that pain medication was effective. She used a cane and walker at the time, testified to having trouble walking, standing, and sitting for long periods of time, and that she was "unable to drive." She testified that she could shower on her own. She needed assistance "getting out of bed and getting to the restroom, help getting dressed." A.R. 121–28. At the hearing on February 13, 2014, Ms. Gray testified that since the last hearing, "things have gotten worse" and that her pain was more intense. She reported that on some days she needs assistance bathing, dressing, fixing food, and getting to the restroom. A.R. 94–102. On June 10, 2016, Ms. Gray requested a continuance to find representation. A.R. 86–87.

Robert Sklaroff, M.D., testified as a medical expert at the hearing based on his review of the medical record.[219] He opined that Ms. Gray "should be able to stand, sit or walk, any one of them, up to six hours during a normal eight-hour day, with normal breaks," that she should be able to "push, pull, squat, bend, reach . . . lift, at least, 50 pounds occasionally, 25 pounds frequently." Dr. Sklaroff also opined that she should not be at heights or on ropes, scaffolds, ladders, or hazardous machinery. He did not "see anything in the record" that supported Ms. Gray's need to use a walker.[220]

Margaret Moore, Ph.D., also testified as a medical expert at the hearing based on her review of the records.[221] She opined that "there is really very little in the way of formal mental health treatment. This is a Claimant who saw a therapist for several months in 2013; had some medication management services in that relative time frame in 2013; and then [had Dr. Cherry's] evaluation solicited . . . very recently." Dr. Moore opined that Ms. Gray's mental impairment was "moderate and it's primarily, I think, the medication." She quoted Dr. Cherry's evaluation that "nearly all of [Ms. Gray's] issues are not the products of brain dysfunction but of various sedating medicines or medications to the point of almost being obtundent." Dr. Moore opined, "I think we really have someone here who is just clearly overusing medicines and experiences the side effects from those" and that the narcotic pain prescriptions she was receiving were "inappropriate." Dr. Moore also

_____

[219] A.R. 2040–51.

[220] A.R. 53–60.

[221] A.R. 2038–39.

opined that she did not see a "clear, formal diagnosis" of somatoform disorder in the medical record. She critiqued Dr. Cherry's evaluation, find it "amazing that Dr. Cherry would go ahead and make the formal diagnoses that he did" in light of Ms. Gray's failed internal validity assessments at the Cherry evaluation. In Dr. Moore's view, Ms. Gray is "probably overly dependent on prescription medications that compromise her ability to focus but I really do not see a good cause for post-traumatic stress disorder, nor necessarily severe depression." Dr. Moore would recognize a level of depression, a mild form of anxiety, and would consider a diagnosis of substance dependence. She opined that Ms. Gray had mild limitations in daily living, mild to moderate social impairments, moderate impairment of concentration, persistence, and pace, due primarily to medication, and no evidence of episodes of decompensation.[222]

*Function Reports*

On July 11, 2014, Ms. Gray completed a function report. She stated that she was "in pain all the time." She reported that she needed help dressing, using the restroom, and caring for her hair, but could prepare "quick meals" and do light dusting and pick up. She reported that she could walk ten to twenty steps before stopping and regularly used a walker, wheelchair, motor scooter, cane, and brace/splint. She also reported that her "mood has changed" and that she was "easily frustrated, irritated and angry."[223]

---

[222] A.R. 60–69.

[223] A.R. 586–93. Ms. Gray's previous function report, completed on October 30, 2012, is consistent with the July 11, 2014 report. In the 2012 report, Ms. Gray stated that she was "in constant pain that is only slightly under control w[ith] prescribed narcotics" and that she was "unable to stand, sit, or walk for longer than 15-20 min[ute]s." She reported that she could prepare

On July 12, 2014, Ms. Gray's friend, Viola Raye Smith, provided a function report on Ms. Gray's behalf. She reported that Ms. Gray was in "constant pain" and that her sleep is "broken and not restful." She reported that Ms. Gray needed assistance with personal care and does not cook, do housework, or drive. She also stated that "the amount of medication she takes does not allow her to drive."[224]

On July 13, 2014, Ms. Gray's fiancé, Craig Welch, provided a function report. He reported that Ms. Gray was unable to work due to her injuries and daily pain. He reported that her medications make her sleepy and "sometimes keep her from sleeping." He reported that he and Ms. Gray's daughter assist Ms. Gray with personal care, food preparation, and household chores, but that Ms. Gray could pay bills, count change, handle a savings account, and use checks. He also reported that Ms. Gray walks with a cane for assistance; she also uses a walker, scooter, and a brace/splint. Mr. Welch drives her to appointments due to medication and pain.[225]

Ms. Gray's son, Derric Echey, also provided a function report on July 13, 2014. He reported that Ms. Gray could not work because of "daily pain" and that her medications make her very drowsy. He also reported that Ms. Gray needs assistance with personal

---

cereal, sandwiches, and vegetables, that she could not do any house or yard work, but could drive "on very rare occasions," shop at stores, pay bills, and count change. She indicated that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing were all affected by her 2011 injury. A.R. 487–94.

[224] A.R. 594–601. Friends Terri Pilcher and Katrina Osborne also completed third-party function reports that are each similar to Ms. Smith's account of Ms. Gray's limitations. A.R. 569–585.

[225] A.R. 610–17.

care, does some light housework, and can pay bills and count change, but does not drive.[226]

## IV.   DISCUSSION

Ms. Gray asserts in her opening brief that "the ALJ erred (1) in finding that [Ms. Gray]'s pain disorder was not a severe impairment at Step Two; (2) in his weighing of [Ms. Gray]'s allegations about the severity and limiting effects of her impairments; and (3) in his weighing of the medical opinion evidence."[227]   The Commissioner disagrees.[228]

### A.   <u>Severe Mental Impairment</u>

Ms. Gray alleges that "the ALJ erred in finding that [she] did not have a severe mental impairment that contributed to her symptoms."  Specifically, she asserts that her "psychological pain, whether a chronic pain syndrome or somatoform disorder, results in more than minimal impact on her ability to perform basic work activities."[229]   The Commissioner argues that the ALJ did not commit legal error at step two.  Specifically, the Commissioner asserts that Ms. Gray "has not provided any credible evidence of how she was significantly limited by somatoform disorder/pain disorder that lasted at least twelve continuous months."  Further, the Commissioner asserts that "it was harmless error, at most, that the ALJ did not specifically identify a somatoform/pain disorder at

---

[226] A.R. 602–09.

[227] Docket 18 at 1.

[228] Docket 22.

[229] Docket 18 at 6.

step two of the sequential evaluation process because he did in fact include multiple limitations pertaining to a pain disorder within his RFC assessment."[230]

### 1.   Legal Standard

The Social Security regulations define severe impairment as an impairment which significantly limits a claimant's "ability to do basic work activities."[231]  Step two is a "de minimis screening device to dispose of groundless claims."[232]  Further, to be severe, the impairment must "result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[233]

### 2.   Analysis

The ALJ found that a "somatoform disorder is not a medically determinable impairment for [Ms. Gray]."  He noted that testifying medical expert Dr. Moore found "no reason" to make a somatoform disorder diagnosis and "no clear or formal diagnosis was

---

[230] Docket 22 at 14–15.

[231] 20 C.F.R. §§ 404.1521, 416.921; *see also Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005) (an ALJ must have substantial evidence to find that the medical evidence clearly establishes that the claimant lacks a medically severe impairment or combination of impairments).

[232] *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).

[233] 20 C.F.R. §§ 404.1521, 416.921.

made of somatoform disorder under section 12.08[234] of the Listings."[235]

Although the ALJ determined that somatoform disorder was not a medically determinable impairment for Ms. Gray, he still reviewed and analyzed treatment notes and findings discussing the potentially psychological elements of Ms. Gray's pain symptoms. The record does not contain objective medical evidence demonstrating a formal somatoform diagnosis. Moreover, ALJ Hebda did not end the sequential analysis at step two; he addressed Ms. Gray's pain symptoms throughout the decision and considered pain in determining her RFC.[236] For example, the ALJ cited Dr. Cant's observation that "when [Ms. Gray] was distracted, she did not complain of pain while the doctor was pressing on the lumbar spine and right sided paraspinal muscles. However, later when Dr. Cant asked if this pressing was painful, the claimant winced."[237] Additionally, the ALJ noted that Dr. Pervier "also observed the claimant had no appearance of pain until she shifted onto her right hip after 20 minutes" and concluded that Ms. Gray's limitations were "magnified symptom-wise, based on non-organic

---

[234] The ALJ's citation to Listing 12.08 (Personality Disorders) rather than Listing 12.07 (Somatic Symptom Disorders) is harmless error as the requirements for Paragraph B of Listing 12.07 and 12.08 are identical. *Turner v. Berryhill,* 705 Fed.Appx. 495, 498 (9th Cir. 2017); *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015).

[235] A.R. 22. *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07 (effective August 22, 2017 to March 13, 2018) (*Somatic Symptom and Related Disorders* are "[p]hysical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical conditions, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience").

[236] *Cf. Webb,* 433 F.3d at 687 (ALJ erroneously ended inquiry at step two).

[237] A.R. 847.

features."[238]  The ALJ also noted independent medical examiner Dr. Bald's[239] finding that "[t]he only explanation for [Ms. Gray's] current condition is related to a fairly dramatic psychogenic case of persistent pain and self-imposed disability."[240]  He noted that Dr. Moore determined that Dr. Cherry's conclusions "were based on an evaluation of marginal validity with [Ms. Gray] trying to look as disabled as she could."[241]  The ALJ also noted that Dr. Cherry did not diagnose somatoform disorder, but instead listed it as a provisional or "rule out" diagnosis.[242]  Based on the foregoing, the Court finds that substantial evidence in the record as whole supports the ALJ's finding that Ms. Gray did not have a severe impairment of somatoform disorder.

Even if the ALJ erred by finding that somatoform disorder was not a medically determinable impairment for Ms. Gray, such error was harmless.  The ALJ analyzed the evidence in the record regarding the psychological element of Ms. Gray's pain allegations and considered her pain symptoms in determining her RFC.

B.    Ms. Gray's Credibility

Ms. Gray alleges that the ALJ "did not give clear and convincing reasons for finding [Ms. Gray]'s allegations not fully credible."  Specifically, she asserts that "the

---

[238] A.R. 1500.

[239] The ALJ cited "Douglas Bell, M.D.," but the record shows "Douglas Bald, M.D.," is the correct name.  A.R. 1086–97.

[240] A.R. 27, 1086–97.

[241] A.R. 22.

[242] A.R. 2122.

ALJ's finding that [her] allegations were inconsistent with the medical evidence was not based on the correct legal standard."  Further, Ms. Gray claims that the ALJ "erred in basing his finding of inconsistency on the opinion of the independent medical examiner and a notation that treatment had been effective."[243]  The Commissioner asserts that the ALJ "properly determined, based on the totality of the record, that [Ms. Gray]'s subjective allegations were not entirely credible."  The Commissioner argues that "[i]n the present case, the reliable evidence supports [Ms. Gray]'s allegations that she experienced some limitations, but does not support [Ms. Gray]'s allegations that she is incapable of working."[244]

     1.    *Legal Standard*

An ALJ's credibility assessment has two steps.[245]  First, the ALJ determines whether the claimant has presented objective medical evidence of an underlying impairment that "could reasonably be expected to produce the pain or other symptoms alleged."[246]  Second, "if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide 'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the

---

[243] Docket 18 at 12.

[244] Docket 22 at 6, 12.

[245] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014).

[246] *Lingenfelter v. Astrue*, 504 F.3d 1028,1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

claimant's symptoms."[247]

In the first step, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."[248] On this point, the ALJ held that Ms. Gray's degenerative disc disease of the lumbar and cervical spines, obesity, hypertension, headache, migraine headache, depression NOS, anxiety NOS, personality disorder/cluster B traits, and prescription narcotic overuse, were medically determinable severe impairments that could reasonably be expected to cause pain symptoms.[249]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's symptoms by considering "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him]."[250] If a claimant produces objective medical evidence of an underlying impairment, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and

---

[247] *Treichler*, 775 F.3d at 1102 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996)).

[248] *Smolen*, 80 F.3d at 1282.

[249] A.R. 19.

[250] 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (effective June 13, 2011 to March 26, 2017) (important indicators of the intensity and persistence of a claimant's symptoms include information such as "what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living.").

convincing reasons for doing so."[251]   The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[252]   Here, the ALJ found Ms. Gray's "statements concerning the intensity, persistence and limiting effects" of her current medically determinable impairments were not "entirely consistent with the medical evidence and other evidence in the record."

    2.    *Analysis*

The ALJ provided several reasons for his adverse credibility determination.  First, the ALJ noted that "[m]edical findings are persistently the same and normal."[253]   The record fully supports this finding.  Throughout the record, Ms. Gray's treating physicians documented that while Ms. Gray reported significant pain, MRIs and x-rays were essentially normal, with scoliosis in the thoracic and lumbar spine and mild disc degeneration and stenosis.[254]   Additionally, her range of motion and motor strength were unaffected and she was frequently advised by providers to pursue physical therapy.[255]   Treatment notes indicate that chiropractic care and pain medications

---

[251] *Smolen,* 80 F.3d at 1281.

[252] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001)); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

[253] A.R. 26.

[254] A.R. 26–27, 787–88, 990, 1227–30, 1579–80, 1699–70, 1736–37, 1917, 1957–62.

[255] A.R. 26–27, 777–79, 791, 831, 847–51, 865, 869, 928–31, 967–71, 1330–31, 1479–84, 1581–83, 1646–47, 1661–62, 1694–96, 1710–11, 2072–73.

provided effective pain relief.[256]

The ALJ also found that Ms. Gray's allegations of pain and pain behaviors were inconsistent with objective findings.[257]  In addition to the opinions of Drs. Cant, Bald, and Pervier, there are many other reports of inconsistencies by providers in the medical record.  For example, PA Fulp noted at one examination that he had "no great explanation as to why [Ms. Gray] is having such significant limited mobility and pain with any type of mobility.  She generally has normal imaging."[258]  In her evaluation of Ms. Gray, Dr. Samuelson noted that although Ms. Gray had pain, "there is no clear medical explanation for this pain."[259]  Dr. Peterson at Algone noted that he was "[u]ncertain of [the] source of pain" in Ms. Gray's low back and legs.[260]  At a visit on March 15, 2016, PA Fitzgerald noted "[n]othing that really explains all of her pain."[261]

Third, the ALJ determined that the "record shows failure by [Ms. Gray] to follow medical recommendations."[262]  This finding is also fully supported by substantial evidence

---

[256] A.R. 981, 985–88, 991–1003, 1011–1047, 1051, 1073, 1076, 1079, 1144, 1178, 1180, 1182, 1356–60, 1605–09, 1704–06, 1759–62, 1764–67, 1779–81, 1853–57, 1875–82, 1888–95, 1944–48.

[257] A.R. 27.

[258] A.R. 928–31.

[259] A.R. 1524–28.

[260] A.R. 1718–22.

[261] A.R. 1957–62.

[262] A.R. 27.

in the record. Treatment notes indicate inconsistent dosing by Ms. Gray and a failure to follow physicians' advice. As the ALJ found, Ms. Gray reported not filling prescriptions after the December 29, 2011 emergency room visit, "because she doesn't like to take medications." At the same visit with Dr. Brown from PMFC, Ms. Gray also reported that she was not taking any medications, including diabetic medications, with no reason given.[263] Additionally, treatment notes show that Dr. Wagner repeatedly declined refills of Ms. Gray's pain medications.[264] Twice, drug screens for Ms. Gray's prescribed medications showed Norco was not detected.[265] Providers noted in the record that Ms. Gray was unable to follow her medication regimen, had "random medication dosing," and inconsistent answers regarding medications.[266] PA Fitzgerald diagnosed her with high risk medication use and at one visit, noted that Ms. Gray had stated she had stopped taking her medications because she "got tired of taking pills."[267]

Based on the foregoing, the Court finds that the ALJ provided specific, clear, and convincing reasons supported by substantial evidence in the record for his determination that Ms. Gray's allegations regarding the severity and functional impact of her pain symptoms were not wholly credible.

---

[263] A.R. 27, 814–17,

[264] A.R. 843–44, 1388, 1453–55,

[265] A.R. 1388, 1625–31, 2023–24.

[266] A.R. 1536, 1570, 1593.

[267] A.R. 1640–41, 1688–90.

C.    Medical Opinions and Other Examining Sources

Ms. Gray asserts that the ALJ failed to "give specific and legitimate reasons supported by substantial evidence in the record for his weighing of the acceptable medical source opinions." She alleges that the ALJ erred by giving "little weight" to the opinions of Drs. Samuelson, Grissom, and Chandler and by "considering the opinions in isolation of the other evidence in the record, including their own treatment notes." Additionally, Ms. Gray argues that the ALJ "did not give germane reasons in support of his weighing of the opinion evidence from the treating and examining 'other' sources." Specifically, she asserts that the ALJ failed to address Dr. Chalifour's "opinion at all in the decision at hand," failed to "offer a germane reason for giving [OT Kerris's] opinion little weight," and erred in "treating [PA] Fitzgerald's opinion as if it existed in a vacuum."[268]

1.    *Legal Standard.*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[269] Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[270]

---

[268] Docket 18 at 15–23.

[269] 20 C.F.R. § 404.1527(c), 416.927(c). These sections apply to claims filed before March 27, 2017.

[270] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."[271]

In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[272] Even "if a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[273] This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[274] And, the "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."[275]

Factors relevant to evaluating any medical opinion include: (1) the consistency of the medical opinion with the record as a whole; (2) the physician's area of specialization;

---

[271] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

[272] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[273] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[274] *Reddick*, 157 F.3d at 725 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[275] *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995).

(3) the supportability of the physician's opinion through relevant evidence; and (4) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[276]

The SSA also permits a claimant to provide evidence from non-physician sources as to the severity of an impairment and how it affects a claimant's ability to work, including evidence from a nurse practitioner, physician assistant (PA), chiropractor, or therapist, including a physical therapist.[277] The ALJ may discount opinions from these "other sources" if the ALJ "gives reasons germane to each witness for doing so."[278]

2. Dr. Chandler

On October 29, 2012, Ms. Gray first saw Dr. Chandler for an initial evaluation.[279] She next saw Dr. Chandler on November 26, 2012.[280] That same day, Dr. Chandler opined that Ms. Gray was unable to walk two hundred feet without stopping to rest and was severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition. He limited the disability for purposes of a disabled parking identification to six

---

[276] 20 C.F.R. §§ 404.1513a(b), 404.1527(c)(2), 416.913a(b), 416.927(c)(2). These sections apply to claims filed before March 27, 2017. *See* §§ 404.614, 416.325.

[277] 20 C.F.R. §§ 404.1513(d), 416.913(d). These sections apply to claims filed before March 27, 2017.

[278] *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)).

[279] A.R. 1227–29.

[280] A.R. 1336–40.

months.[281]  On December 11, 2012, Dr. Chandler completed a health status form for the State of Alaska based on his October 29, 2012 examination of Ms. Gray.  He opined that Ms. Gray could not work full-time for more than twelve months.[282]  The ALJ gave Dr. Chandler's opinions "little weight" because the ALJ concluded that Dr. Chandler "provided vague reasons for supposed difficulties in walking and cited no objective medical findings."[283]

Dr. Chandler's opinions regarding Ms. Gray's ability to walk were contradicted by Dr. Sklaroff, a non-examining medical expert who testified that he found nothing in his review of the record that supported Ms. Gray's need for an assistive device for ambulation he opined it would be desirable for Ms. Gray to "throw away the crutches" as it would enhance her capacity to function.[284]  Therefore, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Chandler's opinions, based on substantial evidence in the record.[285]

---

[281] A.R. 1335.

[282] A.R. 1330–31.

[283] A.R. 30.

[284] A.R. 57.

[285]  Dr. Sklaroff's testimony alone is not substantial evidence justifying the rejection of Dr. Chandler's November and December 2012 opinions.  *See Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995) (The "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."); *see also Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (the "opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

The ALJ's specific reasons for rejecting Dr. Chandler's opinions regarding Ms. Gray's walking ability are supported by substantial evidence in the record. An ALJ may reject a medical opinion, including a treating physician's opinion, if it is brief, conclusory and inadequately supported by clinical evidence.[286] Dr. Chandler's opinions regarding Ms. Gray's walking ability were cursory opinions based on his first two visits with her.[287] The ALJ noted that Dr. Chandler provided "vague reasons" for Ms. Gray's walking difficulties and did not cite to clinical and laboratory diagnostic techniques in his treatment notes.[288]

### 3.    *Dr. Samuelson*

Dr. Samuelson was one of Ms. Gray's treating physicians at PFMC, although it appears from the record that Ms. Gray only visited Dr. Samuelson on two occasions.[289] The ALJ gave "little weight" to Dr. Samuelson's conclusions regarding Ms. Gray's restrictions "in such activities as lifting and carrying" because the doctor did not provide objective medical evidence for her conclusions.[290]

---

[286] *Thomas v. Barnhart,* 278 F.3d at 957.

[287] A.R. 1227–29, 1336–40. *See also Nyman v. Heckler,* 779 F.2d 528, 531 (9th Cir. 1985) ("Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ." (internal citation omitted)). Dr. Chandler did take x-rays at his initial visit, which showed relatively mild degenerative changes.

[288] *Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001) ("[T]he regulations give more weight to opinions that are explained than to those that are not.").

[289] The record shows Ms. Gray visited Dr. Samuelson on July 2, 2013 and February 17, 2014. A.R. 1524–28, 2069–71.

[290] A.R. 30.

Dr. Samuelson performed a physical capacity evaluation of Ms. Gray on July 2013, her first visit with that doctor. On that day, Dr. Samuelson opined that Ms. Gray could lift up to ten pounds occasionally, was unable to squat or climb, could bend occasionally and reach frequently, and use her feet and legs for pushing and pulling activities for limited periods of time.[291] These opinions were contradicted by the testimony of Dr. Sklaroff at the September 2016 hearing. Specifically, Dr. Sklaroff opined that Ms. Gray should be able "push, pull, squat, bend, reach, etcetera; lift, at least, 50 pounds occasionally, 25 pounds frequently."[292] As with Dr. Chandler, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for rejecting Dr. Samuelson's opinions regarding Ms. Gray's physical capabilities.

Here, the ALJ's specific reason for rejecting Dr. Samuelson's opinions regarding Ms. Gray's restrictions in activities such as lifting and carrying, is supported by substantial evidence in the record. The answers provided by Dr. Samuelson in the physical capacity evaluation questionnaire of July 2013 were primarily based on subjective reports of pain by Ms. Gray. Indeed, as the ALJ points out, Dr. Samuelson notes that Ms. Gray "has pain, though there is no clear medical explanation for this pain," while also noting that the MRI of the thoracic spine was normal and the x-ray of the lumbar spine showed no fractures and scoliosis.[293]

---

[291] A.R. 30, 1524–28.

[292] A.R. 32, 58.

[293] A.R. 30, 1524–25.

Based on the foregoing, the Court finds that the ALJ provided specific, legitimate reasons, supported by substantial evidence, for rejecting Dr. Samuelson's opinion regarding Ms. Gray's restrictions of activities such as carrying and lifting.

4. *Dr. Grissom*

Dr. Grissom began treating Ms. Gray in August of 2013.[294] At Ms. Gray's initial visit, Dr. Grissom reviewed Ms. Gray's diagnostic studies and conducted a physical exam.[295] He later performed a discectomy, inserted a spinal cord stimulator trial, and prescribed opioid pain medications.[296] He diagnosed Ms. Gray with chronic lumbar radiculopathy, polyarthralgia, degenerative joint disease of the spinal facet joint, carpal tunnel left wrist, and cervical radiculopathy.[297] After a follow up exam on February 12, 2014, Dr. Grissom wrote that it was unclear if or when Ms. Gray would be able to return to work. In a letter and health status form on May 26, 2015, he opined that Ms. Gray could not work full or part time, that she was disabled "due to her medical conditions," and was limited "on her physical capabilities such as walking long distances, sitting for a prolonged time, manipulating stairs (patient uses a walker), lifting and bending, and driving a motor vehicle."[298]

_____

[294] A.R. 1581–83.

[295] A.R. 1813–14.

[296] A.R. 1632–33, 1734–35, 1826–27, 1853–57, 1863–66, 1883–87.

[297] A.R. 1741–44.

[298] A.R. 1637, 1704–06, 1738, 1741–44.

The ALJ gave Dr. Grissom's opinions "little weight" because "[t]hey provide limited information about alleged limitations without providing an explanation for the limitations. Thus, Dr. Grissom is yet another doctor who failed to cite objective medical findings."[299] Again, his opinions regarding Ms. Gray's physical capabilities were contradicted by the testimony of Dr. Sklaroff and again, the ALJ was required to provide specific and legitimate reasons, supported by substantial evidence for rejecting Dr. Grissom's medical opinions.

An ALJ "may discredit treating physicians' opinions that are conclusory, brief an unsupported by the record as a whole or by objective medical findings."[300] But rejecting an opinion by a treating physician on a check-box form simply because it contains almost no details or explanation is not a specific and legitimate reason to reject that opinion if there are extensive treatment notes by that treating physician that support that opinion.[301] Here, the ALJ failed to acknowledge or address Dr. Grissom's treatment notes in rejecting that doctor's opinions. Although Dr. Grissom's forms did not list objective medical findings or provide an extensive explanation for Ms. Gray's limitations in the two letters and health status form, based on his medical expertise, his treatment notes, and treatment history, Dr. Grissom provided an adequate explanation for his opinions regarding Ms. Gray's limitations.[302] Because substantial evidence does not support the specific reason the ALJ

---

[299] A.R. 31.

[300] *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2004).

[301] *See Burrell v. Colvin*, 775. F.3d 1133, 1140 (9th Cir. 2014).

[302] *Cf. Ghanim v. Colvin,* 763 F.3d 1154 (9th Cir. 2014) (reversing ALJ's discrediting of treating

gave for discounting Dr. Grissom's opinions, the ALJ erred in rejecting Dr. Grissom's opinion.

5. *Dr. Chalifour*

Dr. Chalifour was Ms. Gray's chiropractor beginning February 1, 2012.[303] As such, the ALJ was required to take into account evidence from Dr. Chalifour "unless [he] expressly determine[d] to disregard such testimony" and gave reasons for doing so.[304] At the same time, the ALJ is not required to address "every piece of evidence."[305] Here, the ALJ considered Dr. Chalifour's chart notes and concluded that "the information from the chiropractor was the claimant's condition was improving."[306] Although the ALJ did not specifically address Dr. Chalifour's opinions regarding Ms. Gray's inability to work, he provided germane reasons for concluding that the evidence from Dr. Chalifour demonstrated an improvement in Ms. Gray's physical condition.

6. *OT Kerris*

OT Kerris, of Providence Sports Medicine & Rehabilitation Therapies, evaluated Ms. Gray in June 2013.[307] As the ALJ noted, OT Kerris opined that Ms. Gray could

---

physician whose treatment notes were consistent with provider's opinions, but recognizing that a conflict between treatment notes and the provider's opinions may constitute an adequate reason to discredit the opinions).

[303] A.R. 985–98.

[304] *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).

[305] *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).

[306] A.R. 27.

[307] A.R. 1465–74.

tolerate a sedentary level of work, could lift ten pounds and carry five pounds unilaterally, and although unable to squat, Ms. Gray could stair climb, rotate her trunk while sitting or standing, and kneel occasionally. OT Kerris also opined that Ms. Gray's self-limiting behavior was within normal limits.[308] OT Kerris was an examining source as the record shows she only saw Ms. Gray for the evaluation. The ALJ gave OT Kerris's opinion "little weight" because he determined that she "did not provide objective medical [evidence] for [her] conclusions regarding the restrictions in such activities as lifting and carrying."[309] OT Kerris's opinions regarding Ms. Gray's activities such as lifting and carrying were contradicted by the testimony of the medical expert, Dr. Sklaroff.[310]

The ALJ considered OT Kerris's opinions in his RFC determination. For the reasons set forth above, the Court finds that the ALJ provided germane reasons for rejecting OT Kerris's opinion regarding Ms. Gray's restrictions of activities such as carrying and lifting.

### 7. *PA Fitzgerald*

PA Fitzgerald, at Algone, treated Ms. Gray regularly from November 2013 through March of 2016.[311] On November 11, 2013, PA Fitzgerald diagnosed Ms. Gray with

---

[308] A.R. 30, 1465–74.

[309] A.R. 30.

[310] A.R. 58.

[311] A.R. 1640–41,1645, 1661–62, 1688–90, 1694–96, 1707–11, 1723–24, 1753–58, 1944–48, 1957–62.

degenerative disk disease and chronic lumbar radiculopathy. She opined that Ms. Gray

would not be able to work full or part-time for six months and that Ms. Gray's medications

caused drowsiness.[312] In May of 2014, PA Fitzgerald opined that Ms. Gray would not be

able to work for twelve months.[313] The ALJ gave her opinions little weight "due to the little

information provided." He noted specifically that PA Fitzgerald "may have concluded the

claimant could not work, but she provided no citation to evidence to support her

conclusion."[314]

Although PA Fitzgerald did not specifically list objective medical findings or provide

an extensive explanation for Ms. Gray's limitations in the health status forms she filled out

in November 2013 and May 2014, based on her treatment notes, and treatment history,

PA Fitzgerald provided an adequate explanation for Ms. Gray's limitations. Rejecting a

cursory form when there are extensive treatment notes prepared by the provider in the

record simply because the form itself did not contain an explanation is not a germane

reason to reject the opinions set out in the form. Therefore, the ALJ erred in rejecting PA

Fitzgerald's opinions.

D.    Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the

reviewing court simply cannot evaluate the challenged agency action on the basis of the

---

[312] A.R. 31, 1661–62.

[313] A.R. 31, 1710–11.

[314] A.R. 31.

record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[315] The court follows a three-step analysis to determine whether the case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[316] "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'"[317] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[318] "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[319] But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[320]

---

[315] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[316] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison*, 759 F.3d at 1020).

[317] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[318] *Treichler*, 775 F.3d at 1101.

[319] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[320] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

Ms. Gray argues that all three conditions are met in this case. The Commissioner responds that "even if the ALJ had committed the errors [Ms. Gray] identifies, an award of benefits would be an inappropriate remedy" because "the medical record raises serious doubts as to whether [Ms. Gray] is disabled."[321]

Here, the Court has found that the ALJ did not provide legally sufficient reasons for rejecting the opinions of Dr. Grissom and PA Fitzgerald. Second, the record has been extensively developed. It contains hundreds of pages of treatment notes from medical visits from December 2011 through 2016, as well as additional records prior to Ms. Gray's alleged onset date. It contains numerous health status reports, imaging results, and medical evaluations. It includes testimony from Ms. Gray about her symptoms and testimony from two medical experts at the September 2016 hearing. Also included are multiple third-party functions reports. Third, if Dr. Grissom's and PA Fitzgerald's disability opinions are credited as true, the ALJ would have been required to find Ms. Gray to be disabled. Thus, all three conditions to credit-as-true have been satisfied.

But the Court agrees with the Commissioner that a remand for immediate benefits is not warranted in this case.[322] The record contains objective medical findings that are consistently within normal limits and inconsistent with disability pain as well as a continuing failure by Ms. Gray to follow medical recommendations. The record also

---

[321] Docket 22 at 22–23.

[322] The Ninth Circuit has clarified that courts will "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison v. Colvin,* 759 F.3d 995, 1021 (9th Cir. 2014); *Burrell v. Colvin,* 775 F.3d 1133, 1141 (9th Cir. 2014).

contains concerning inconsistencies in Ms. Gray's reports of pain. The Ninth Circuit has "previously awarded benefits without further administrative proceedings only when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within the record supported the reasons provided by the ALJ for denial of benefits."[323] Based on this Court's review of the record as a whole, that is not the case here. Thus, even if the three conditions to credit-as-true have been met here, the "rare circumstances" that could warrant a remand for the calculation and award of benefits are not present. To the contrary, the Court's evaluation of the entire record creates serious doubt as to whether Ms. Gray is, in fact, totally disabled.[324] Therefore, the case will be remanded for additional proceedings.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's reasons for rejecting the opinions of Dr. Grissom and PA Fitzgerald are not free from legal error. Accordingly, IT IS ORDERED that Ms. Gray's request for relief at Docket 1 is GRANTED IN PART as set forth herein, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

---

[323] *Leon v. Berryhill,* 874 F.3d 1130, 1135 (9th Cir. 2017).

[324] *See Trevizo v. Berryhill*, 862 F.3d 987, 999 n.4 (9th Cir. 2017) ("[W]e rely only on the ALJ's stated bases for rejecting Trevizo's disability claims. Because the ALJ did not provide these explanations herself as a reason to reject Dr. Galhotra's opinion, the district court erred in looking to the remainder of the record to support the ALJ's decision, and we cannot affirm on those grounds.") (internal citations omitted).

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 14th day of August, 2018 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE